1   GRODSKY, OLECKI & PURITSKY LLP
2   Allen B. Grodsky (SBN 111064)
    *allen@thegolawfirm.com*
3   Tim B. Henderson (SBN 281159)
    *tim@thegolawfirm.com*
4   11111 Santa Monica Boulevard, Suite 1070
    Los Angeles, California 90025
5   Telephone:   (310) 315-3009
    Facsimile:   (310) 315-1557

6   Attorneys for Defendants
7   Robert Kirkman and Robert Kirkman, LLC

8               UNITED STATES DISTRICT COURT

9              CENTRAL DISTRICT OF CALIFORNIA

10                   WESTERN DIVISION

11

12  WILLIAM CRABTREE,                   Case No. 2:22-cv-00180-MEMF (AFM)

13          Plaintiff,                  Before the Hon. Maame Ewusi-Mensah
                                        Frimpong, U.S. District Court Judge
14      vs.

15  ROBERT KIRKMAN, an individual;      **JOINT BRIEF RE DEFENDANTS**
    ROBERT KIRKMAN, LLC, a              **ROBERT KIRKMAN AND ROBERT**
16  Kentucky limited liability company, **KIRKMAN, LLC'S MOTION FOR**
    and DOES 1-10, inclusive.,          **SUMMARY JUDGMENT OR, IN THE**
17                                       **ALTERNATIVE, PARTIAL**
            Defendants.                 **SUMMARY JUDGMENT**
18
19                                      [Notice of Motion and Motion, Request
                                        for Judicial Notice, Evidentiary Appendix,
20                                      Statements of Uncontroverted Facts and
                                        Law, Proposed Judgment and Proposed
21                                      Order filed concurrently]

22                                      Action filed:      January 9, 2022
                                        Current trial date: September 11, 2023
23
24                                      Hearing

25                                      Date: July 27, 2023
                                        Time: 10:00 a.m.
26                                              United States Courthouse
                                                Courtroom 8B
27                                              350 West First Street
                                                Los Angeles, CA 90012
28

# TABLE OF CONTENTS

**Kirkman's Opening Brief**                                                                          **Page**

1.    INTRODUCTION ................................................................ 11

2.    STATEMENT OF UNDISPUTED FACTS ................................................ 13

    A.    Kirkman Creates The Comic Book *Invincible* And Hires Crabtree To Color It ................................................ 13

    B.    Crabtree Signs A Certificate of Authorship Confirming His Contribution Was Work-For-Hire And Assigning All Rights To Kirkman .................................................................... 14

    C.    Kirkman Enters Deals With Paramount And MTV on *Invincible* And Pays Crabtree Two Bonuses ................................ 15

    D.    Crabtree Asks For Profits On *Invincible* And Kirkman Refuses ................................................ 15

    E.    Crabtree Confirms He Understood In 2012 that Kirkman Denied Owing Him Royalties ................................ 17

    F.    Crabtree Is Aware Of, But Is Not Paid A Share of Profits On, Various Types of *Invincible* Books And Branded Products ............... 17

    G.    Crabtree Files Suit ................................................ 18

3.    LEGAL STANDARDS ............................................................ 18

4.    ARGUMENT ...................................................................... 18

    A.    Crabtree's Copyright Claims Are Barred By The Three-Year Statute of Limitations ................................ 18

        1.    Crabtree's Ownership Claim Was Plainly And Expressly Repudiated Numerous Times Starting In 2003 ................... 19

            (a)    Crabtree Was Never Listed As A Co-Creator Or Copyright Owner On Printed Issues of *Invincible* .......... 19

            (b)    Crabtree Signed The Certificate of Authorship, Agreeing That He Did Not Own *Invincible* And He Assigned any Rights He May Have Had ..................... 19

            (c)    Kirkman Expressly Repudiated Crabtree's Claimed Ownership Interest In Writing ......................... 20

            (d)    Crabtree Knew About Other *Invincible* Products For Which He Was Not Being Paid A Share of Royalties ................................................ 22

# TABLE OF CONTENTS
## (Cont'd)

**Kirkman's Opening Brief (Cont'd)**      **Page**

         2.     Equitable Estoppel Does Not Save Crabtree's Claims ............. 23

    B.    Crabtree's Fraud Claims Are Barred By The Three-Year Statute of Limitations ....................................... 24

    C.    Crabtree's Breach of Contract Claim Is Barred By The Two-Year Statute of Limitations ........................................ 26

    D.    Crabtree's Declaratory Relief Claim About The Meaning Of The Certificate Of Authorship Is Also Time Barred ................... 28

    E.    Kirkman Is Entitled To Partial Summary Judgment That Crabtree Is Not Owed Royalties On Sales Of Trade Paperbacks ....... 29

5.    CONCLUSION ................................................... 29


**Crabtree's Opposition Brief**      **Page**

I.     INTRODUCTION ................................................. 30

II.    STATEMENT OF DISPUTED FACTS ........................ 31

    A.    Crabtree, Kirkman and Cory Walker Co-Create The Work And Agree To Compensation Terms .................................... 31

    B.    Kirkman Fraudulently Induces Crabtree To "Assign" His Copyright In The Works To Kirkman's Loan Out Company ............. 33

    C.    Kirkman Continues To Pay Crabtree For Motion Picture And Other Licensing Of The Work ....................................... 34

    D.    Kirkman Does Not Repudiate The Parties' Agreement In The March 2012 Email Chain ......................................... 35

    E.    Crabtree Learns Of The Amazon Prime Series And Finally Receives A Copy Of the Certificate Of Authorship In August 2020 ................................................... 38

III.   LEGAL STANDARD ........................................... 39

# TABLE OF CONTENTS
(Cont'd)

**Crabtree's Opposition Brief (Cont'd)** **Page**

IV. ARGUMENT ............................................................................................... 39

    A. Kirkman's Motion for Summary Judgment Is Procedurally Defective As It Does Not Comply With The Scheduling Order ........ 39

    B. Crabtree's Copyright Claims Are Not Barred By The Three year Statute Of Limitations And Disputed Facts Abound ............................................................................................... 40

        1. There Has Never Been An Express Repudiation Of Crabtree's Copyright Ownership In The Work ....................... 40

            a. The Printed Issues Of The Work Do Not Constitute An Express Repudiation And List Crabtree On Equal Billing With Kirkman ................................................. 41

            b. The Certificate of Authorship Is Legally Invalid And Was Procured Through Fraud ....................................... 43

            c. The March 2012 Emails Do Not Constitute A Repudiation Of Crabtree's Copyright Interest ................... 44

            d. The Sale Of Other *Invincible* Products Does Not Constitute A Repudiation ............................................... 45

        2. The Statute Of Limitations Was Equitably Tolled Because Kirkman Lulled Crabtree Into Inaction ..................... 46

    C. Crabtree's Fraud Cause Of Action Is Not Barred By The The Statute Of Limitations ................................................................. 47

    D. Crabtree's Breach Of Oral Agreement Claim Is Not Barred By The Statute Of Limitations ............................................................. 49

    E. Crabtree's Declaratory Relief Claim Did Not Accrue Until 2020 And Is Not Time Barred ............................................................. 51

    F. Partial Summary Judgment As Entitlement To Royalties On "Trade Paperbacks" Is Not Appropriate As Crabtree Has Never Made A Claim To Such Royalties ............................................................. 53

V. CONCLUSION ......................................................................................... 53

# **TABLE OF CONTENTS**
(Cont'd)

**Kirkman's Reply Brief**                                                                          **Page**

1.      INTRODUCTION ......................................................................... 54

2.      ARGUMENT ............................................................................... 54

        A.      Crabtree's Copyright Ownership Claim Is
                Time-Barred Because Crabtree's Ownership Was
                Repudiated In 2012 At The Latest ................................... 54

                1.      Crabtree Admits The Parties Were In A Close Relationship ... 54

                2.      Crabtree's Subjective Interpretation Is Irrelevant ................... 55

                3.      Crabtree Ignores Critical Admissions In The 2012 Emails ...... 56

                4.      The Printed Issues Further Prove Repudiation ......................... 56

                5.      The Certificate of Authorship Repudiated Crabtree's Claim ... 57

                6.      Sale Of *Invincible* Products Repudiated Crabtree's Claim ...... 58

                7.      Equitable Tolling And Estoppel Do Not Apply ....................... 58

        B.      Crabtree Crabtree's State Law Claims Are Time-Barred ................... 59

        C.      The Court Should Enter Judgment On Trade Paperback Profits ........ 60

3.      CONCLUSION ............................................................................ 60

1

# JOINT TABLE OF AUTHORITIES

2

**Cases**                                                                    **Page(s)**

3

4

Aalmuhammed v. Lee,
        202 F.3d 1227 (9th Cir. 2000)...................................................18, 19, 40, 42

5

6

Al-Ahmed v. Twitter, Inc.,
        603 F. Supp. 3d 857 (N.D. Cal. 2022) ..........................................27

7

8

Allan v. GreenPoint Mortg. Funding,
        730 F.Supp.2d 1071 (N.D. Cal. 2010) .........................................23

9

10

Anderson v. Liberty Lobby, Inc.,
        477 U.S. 242 (1986) ...................................................................39

11

12

Armstrong Petroleum Corp. v. Tri–Valley Oil & Gas Co.,
        116 Cal. App. 4th 1375 (2004).....................................................27

13

14

Aryeh v. Canon Bus. Sols., Inc.,
        55 Cal. 4th 1185 (2013)..........................................................26, 27

15

16

Celotex Corp. v. Catrett,
        477 U.S. 317 (1986) ...................................................................39

17

18

Corley v. FedEx Ground Package Sys. Inc.,
        No. 519CV00429OD-WSHKX, 2020 WL 1652547
        (C.D. Cal. Mar. 2, 2020)..............................................................28

19

20

Doe v. Marten,
        49 Cal. App. 5th 1022 (2020).......................................................48

21

22

Donen v. Paramount Pictures Corp.,
        2008 WL 5054340, at *5 (C.D. Cal. Nov. 20, 2008)..............41, 57

23

24

Elliott v. Versa CIC, L.P.,
        349 F. Supp. 3d 1000, at *1003 (S.D. Cal. Nov. 16, 2018) .........53

25

26

Fahmy v. Jay-Z,
        835 F. Supp. 2d 783 (C.D. Cal. 2011)..........................................23

27

28

# JOINT TABLE OF AUTHORITIES

(Cont'd)

**Cases**                                                                 **Page(s)**

Ford v. Ray,
   130 F. Supp.3d 1358 (W.D. Wash 2015)........................................40

Fox v. Ethicon Endo-Surgery, Inc.,
   35 Cal. 4th 797 (2005)............................................................24, 51

Garrison v. Oracle Corp.,
   159 F. Supp. 3d 1044 (N.D. Cal. 2016) ..........................................27

Gilkyson v. Disney Enterprises, Inc.,
   244 Cal. App. 4th 1336 (2016)..............................................50, 60

Ginsberg v. Gamson,
   205 Cal. App. 4th 873 (2012)....................................................51

Howard Jarvis Taxpayers Assn. v. City of La Habra,
   25 Cal.4th 809 (2001)............................................................51

In re Napster, Inc. Copyright Litigation,
   2005 WL 289977, at *5 (N.D. Cal. Feb. 3, 2005)..........................46

Kiely v. Universal Music Grp.,
   No. LACV194826MWFSSX, 2019 WL 9443183
   (C.D. Cal. Dec. 12, 2019)....................................................23, 41

Kline v. Turner,
   87 Cal.App.4th 1369 (2001)....................................................59

Lantzy v. Centex Homes,
   31 Cal. 4th 363 (2003)............................................................48

Laraway v. First Nat'l Bank of La Verne,
   39 Cal. App. 2d 718 (1940)....................................................47

Pisciotti v. Brittingham,
   2022 WL 2392198, *12 (W.D. Wash. July 1, 2022) ..................40, 57

# JOINT TABLE OF AUTHORITIES

(Cont'd)

**Cases**                                                                                    **Page(s)**

Price v. Fox Entm't Group,
    473 F.Supp.2d 446 (SDNY Jan. 26, 2007) ...............................................21, 58

Robertson v. Burdon,
    2019 WL 2141971, at *13 (C.D. Cal. Apr. 3, 2019)...............................41, 57

Romano v. Rockwell Internat., Inc.,
    14 Cal. 4th 479 (1996)....................................................................................51

S. Cal. Gas. Co. v. City of Santa Ana,
    336 F.3d 885 (9th Cir. 2003)..........................................................................40

Schiller & Schmidt, Inc. v. Nordisco Corp.,
    969 F.2d 410 (7th Cir. 1992)..........................................................................44

Scorpio Music (Black Scorpio) S.A. v. Willis,
    2013 WL 790940, at *6 (S.D. Cal. Mar. 4, 2013)....................................41, 57

Seven Arts Filmed Entertainment Limited v. Content Media Corp., PLC,
    2011 WL 13143546, at *7 (C.D. Cal. Oct. 3, 2011) ....................................46,

Seven Arts Filmed Ent. v. Content Media Corp.,
    733 F.3d 1251 (9th Cir. 2013)...........................................................22, 40, 58

Silva v. Sunich,
    No. CV 03-9327 GPS (CWX), 2006 WL 6116645
    (C.D. Cal. Sept. 6, 2006) ...........................................................19, 21, 22, 42

Snyder v. Cal. Ins. Guar. Ass'n,
    229 Cal. App. 4th 1196 (2014).......................................................................28

Straughter v. Concord Music,
    2020 WL 6821313, at *5 (C.D. Cal. 2020)....................................................55

Supermail Cargo, Inc. v. United States,
    68 F.3d 1204 (9th Cir. 1995).........................................................................46

# JOINT TABLE OF AUTHORITIES
(Cont'd)

**Cases**                                                                                   **Page(s)**

T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n,
 809 F.2d 626 (9th Cir. 1987) ..................................................................... 39

Victor Oil v. Drum,
 184 Cal. 226 (1920) ............................................................................... 47

Weber v. Geffen Records, Inc.,
 63 F.Supp.2d 458 (SDNY 1999) ............................................................... 55

Wilshire Westwood Assocs. v. Atl. Richfield Co.,
 20 Cal.App.4th 732 (1993) ...................................................................... 59

Zahedi v. Miramax, LLC,
 No. 2:20-CV-04512-MCS-E, 2022 WL 4596551
 (C.D. Cal. Aug. 19, 2022) ................................................................. 22, 54

Zuill v. Shanahan,
 80 F.3d 1366 (9th Cir. 1996) ......................................................... 19, 21, 40


**Statutes**

17 U.S.C. § 101 ........................................................................................ 43, 49

17 U.S.C. § 507 ........................................................................................ 18, 40

California Code of Civil Procedure § 337 ............................................................ 28

California Code of Civil Procedure § 338 ............................................................ 24

California Code of Civil Procedure § 339 ...................................................... 26, 49

California Evidence Code § 623 ........................................................................ 47

Federal Rule of Civil Procedure 56 ................................................................. 18, 29

## <u>JOINT TABLE OF AUTHORITIES</u>
(Cont'd)

**Page**

**<u>Other</u>**

1 Nimmer on Copyright § 6.10................................................................45

**JOINT BRIEF ON KIRKMAN'S MOTION FOR SUMMARY JUDGMENT**

Defendants Robert Kirkman and Robert Kirkman, LLC ("Kirkman") and Plaintiff William Crabtree ("Crabtree") submit the following joint brief on Kirkman's motion for summary judgment or, in the alternative, partial summary judgment[1]:

**KIRKMAN'S OPENING BRIEF**

## 1.     INTRODUCTION

This case concerns the comic book *Invincible*, which was first published in 2003.  Kirkman is the author of *Invincible* and non-party Cory Walker was the co-creator and first artist to draw the book.  In 2002, Kirkman hired Crabtree to be the colorist, the one who colors in the pictures, on *Invincible*.  In 2005, Crabtree signed a Certificate of Authorship that confirmed Kirkman was the author and owner of *Invincible*, Crabtree's services were provided on a work-for-hire basis, and provided that Crabtree assigned to Kirkman any and all rights Crabtree may have had in *Invincible*.

In 2020, Crabtree sued alleging that he is a co-creator of *Invincible*, that the Certificate of Authorship was fraudulently obtained, and that he and Kirkman had an oral agreement that Crabtree would be paid a share of royalties.  All of Crabtree's claims are barred by the respective statutes of limitation because Crabtree knew the facts giving rise to these claims over a decade ago, if not far earlier.  Crabtree's own emails put a nail in the coffin of his claims.

---

[1]  The current last date to hear motions for summary judgment is June 1, 2023.  But on January 27, 2023, Kirkman asked the Courtroom Deputy Clerk for a hearing date on the motion for summary judgment but the first available date was July 27, which date Kirkman reserved.  Kirkman asked Crabtree to stipulate to a short continuance, but Crabtree refused.  On February 3, Kirkman filed an ex parte to continue the last date for hearings on motions for summary judgment, trial, and pretrial dates, and is awaiting a ruling on that application. Kirkman served his moving papers in accordance with the current June 1 deadline.

*In 2012*, Crabtree emailed Kirkman asking for "his share" of royalties on digital reprints of *Invincible*.  Kirkman's response was unequivocal – Crabtree was not owed "his share."  Kirkman wrote, "***You signed a work for hire contract on Invincible. I've honored that contract.***"  Crabtree was upset, calling Kirkman's response "bullshit."  Kirkman did not waver, stating "***I'm sorry you feel that way, Bill.  But I don't owe you anything.***"  Crabtree's 2012 emails confirm he asked for royalties, and Kirkman refused based on the Certificate of Authorship.

To add to the devastating impact of these emails, in 2020, Crabtree again contacted Kirkman.  Crabtree recounted Kirkman's 2012 rejection nearly verbatim and then said "***that's what I mean by you tricking me into signing***" the Certificate of Authorship.  Crabtree's 2020 email confirms that his understanding in 2012 was that Kirkman had refused to pay him royalties and tricked him into signing the Certificate of Authorship.

These 2012 emails triggered the statute of limitations on Crabtree's copyright claims because they plainly and expressly repudiate his copyright ownership claim.  But, in addition to the damning email evidence, Crabtree's ownership claim was repudiated in several other ways, including because:

- Starting with the first issue in 2003, Crabtree was never listed with Kirkman and Walker as a co-creator or copyright owner on copies of *Invincible* (and Crabtree received several copies of each issue),
- Crabtree signed the Certificate of Authorship, which stated that his contribution was work-for-hire and assigned Kirkman all rights, and
- Crabtree knew about *Invincible* branded products, prior film adaptations, and hard and soft cover collections of individual issues, and knew he was not paid royalties for them as a co-author would be.

These facts also support a statute of limitations defense as to Crabtree's fraud, breach of contract, common count, and related declaratory relief claims.  Crabtree should have brought his Complaint in 2012, but he instead waited in the

weeds until 2022 – after Amazon ordered a new animated television adaption of *Invincible*.  Crabtree's delay is fatal to his claims, and judgment should be entered against Crabtree and in favor of Kirkman as to all claims.  In the alternative, if the Court grants the motion as to any claim, partial summary judgment should be entered as to that claim.

Finally, Crabtree has admitted that he is not entitled to any share of royalties from sales of trade paperbacks of *Invincible*.  If summary judgment is not granted on statute of limitations grounds, the Court should enter partial summary judgment that Crabtree is not owed any share of royalties on revenues from trade paperbacks.

**2.    STATEMENT OF UNDISPUTED FACTS**

**A.    Kirkman Creates The Comic Book *Invincible* And Hires Crabtree To Color It**

Defendant Robert Kirkman is a comic book author and a television and film producer.  Uncontroverted Fact ("UF") No. 1. Robert Kirkman, LLC is Kirkman's loan-out company.  UF No. 2.

Kirkman is the co-creator and author of the comic book and graphic novel series *Invincible*, which was first published in January 2003.  UF No. 3.  Kirkman co-created *Invincible* with artist Cory Walker.  UF No. 4.

Plaintiff William Crabtree was a colorist on some issues of *Invincible*.  UF No. 5.  In the comic book industry, an author writes the story and dialogue, and the art on the pages is typically created in steps.  A penciller draws the images, an inker traces the images and adds additional detail, a letterer adds dialogue to word balloons, and then a colorist adds colors.  UF No. 6.  Crabtree was the third person to work as the colorist on *Invincible* and eventually colored Issues 1-50.   UF No. 7.

Beginning with the first issue, for each issue of *Invincible* for which Crabtree provided coloring services, Kirkman and Walker were credited as "Creators" of *Invincible*, but Crabtree was credited below them as "Colorist."  UF No. 8.  Crabtree was never listed as a co-creator.  UF No. 9.  The issues also reflect that the

1 copyright to *Invincible* is owned by Kirkman and Walker, none of them list

2 Crabtree as copyright owner.  UF No. 10.  Crabtree testified at his deposition that

3 he was sent physical copies of every issue of *Invincible* he worked on as well as

4 copies of the trade paperbacks and hard cover compilations.  UF No. 11.

      **B.**     **Crabtree Signs A Certificate of Authorship Confirming His**

                **Contribution Was Work-For-Hire And Assigning All Rights To**

                **Kirkman**

8       On or about July 14, 2005, Crabtree signed a Certificate of Authorship for his

9 services on *Invincible*.  UF No. 12.  The Certificate of Authorship includes clauses

10 stating that the services rendered by Crabtree were on a work-for-hire basis,

11 deemed Kirkman the "sole author" of *Invincible*, and "owner of all rights of every

12 kind or nature."  UF No. 13.  The Certificate of Authorship also contains an

13 assignment that Crabtree "irrevocably and absolutely assign[s] to [Robert Kirkman,

14 LLC] all of [Crabtree's] rights (copyrights, rights under copyright and otherwise,

15 whether known now or in the future) and all renewals and extensions thereof as

16 may exist now or in the future, in and to the Material throughout the universe and in

17 perpetuity."  UF No. 14.

18       The Certificate of Authorship also stated that Kirkman could "revise, change,

19 modify, dramatize, fictionalize, add material to and/or remove material from the

20 Material as [Robert Kirkman, LLC] shall in its sole discretion deem appropriate,

21 and to use, exploit and advertise the Material, in any form, manner and media,

22 whether now known or hereafter devised, without any further obligation whatsoever

23 to [Crabtree] or any person or entity claiming through or on behalf of [Crabtree]."

24 UF No. 15.

25       Crabtree continued to color *Invincible* after signing the Certificate of

26 Authorship.  The final issue he colored, Issue 50, was published on June 11, 2008.

27 UF No. 16.

28

### C.  **Kirkman Enters Deals With Paramount And MTV On *Invincible* And Pays Crabtree Two Bonuses**

In February 2005, Kirkman entered a deal with Paramount for the possible creation of a motion picture based on *Invincible*.  UF No. 17.  Around this time, Kirkman made a payment to Crabtree from a portion of the Paramount payment.  UF No. 18.

In November 2007, Kirkman entered a deal with MTV for the creation of a motion comic based on *Invincible*. UF No. 19.[2]  Around this time, Kirkman made a payment to Crabtree.  UF No. 20.

### D.  **Crabtree Asks For Profits On *Invincible* And Kirkman Refuses**

On March 16, 2012, Crabtree wrote an email to Kirkman after seeing that digital versions of *Invincible* were for sale on a website called Comixology.  Crabtree asked, "shouldn't i be getting revenue for the first 50 issues that are being sold on there?  This seems similar to the mtv motion comics, which i received my share of."  UF No. 21.

On March 17, Kirkman responded in the negative, "***The digital issues are reprints no different than the [trade paperbacks (TPBs)]. You don't get any royalties on single issues past your page rate.  You didn't get 'your share' of the MTV motion comics. I gave you a bonus because it was an adaptation directly using your work. You signed a work for hire contract on Invincible. I've honored that contract.***"   UF No. 22.

Crabtree replied, angry, calling Kirkman's response "bullshit."  UF No. 23.

Kirkman responded again, reaffirming his position, stating "***I'm sorry you feel that way, Bill.  But I don't owe you anything.***  I paid you for your work and even paid you advances for years when you needed money sooner. I did right by

---

[2] A motion comic is an audio-visual version of a comic that shows the actual cells of a printed comic book but moves them around and adds dialogue and sound effects.  The first *Invincible* motion comic is available here:
https://www.youtube.com/playlist?list=PLsdyTK-Aa5R43pSNuUDFTEESHi-AvS053.

1  you. ***You did the work with the understanding that you weren't getting royalties***

2  ***beyond your page rate***. I find it odd that you'd complain about that now. You did

3  work that you were paid for. What's suddenly different?"  UF No. 24 (emphasis

4  supplied).

5      Also on March 17, Crabtree and Kirkman had a phone call, the only oral

6  conversation they had from 2009 to the present.  UF Nos. 25-26.  During that call,

7  Crabtree stated that he "contended that the digital distribution of *Invincible*

8  constituted single issue sales of the work to which he was entitled to a percentage of

9  proceeds generated above and beyond the $40 per page minimum." Crabtree said

10  that "Kirkman disagreed, contending that the digital distribution of *Invincible*

11  constituted 'reprints' which, according to Kirkman, were not considered 'single

12  issue sales' under the parties' agreement and that Crabtree had purportedly signed

13  what Kirkman described as a 'work for hire contract' that governed copyright

14  ownership of and revenues generated concerning *Invincible* that was not otherwise

15  covered by the parties' agreement. Kirkman analogized the digital distribution of

16  the static comics to the reissues of *Invincible* in the motion comic format, to which

17  Kirkman contended that payments to Crabtree were simply 'bonuses,' not payments

18  pursuant to the parties' agreement." UF No. 27.  Crabtree further stated that

19  "Kirkman held to his position with respect to the digital distribution of *Invincible*

20  not constituting single issue sales under the parties' agreement. Kirkman told

21  Crabtree that he 'felt bad' because Kirkman was now very successful, but that he

22  would attempt to get Crabtree additional colorist opportunities on other projects on

23  which Kirkman was involved."  UF No. 27.

24      Separately, in February 2012 shortly before Crabtree sent his email, Kirkman

25  had been sued by Tony Moore, who had worked as an artist on another Kirkman

26  comic, *The Walking Dead*.  UF No. 28.  In another email in the 2012 email

27  exchange between Kirkman and Crabtree, Crabtree asked Kirkman if the contract

28  Crabtree signed was "the same work for hire contract tony is suing you over at the

moment, correct?"  UF No. 29.  And in his Complaint in this case, Crabtree expressly connected his claims and Moore's earlier claims against Kirkman. Crabtree alleged that "Kirkman was sued by Mr. Moore in 2012 based on allegations of Kirkman fraudulently wresting Mr. Moore's copyright ownership rights in *The Walking Dead* series that are shockingly similar to Mr. Crabtree's allegations herein." UF No. 30.  Mr. Moore was represented in that case by Devin McRae, Crabtree's counsel here.  UF No. 31.

**E.**     **Crabtree Confirms He Understood In 2012 That Kirkman Denied Owing Him Royalties**

Eight years later in August 2020, Crabtree sent another email to Kirkman wherein he described the 2012 email interaction and the circumstances surrounding the Certificate of Authorship.  Crabtree wrote "When you gave me [the Certificate of Authorship] to sign you said, 'our deal's the same, it's just that Hollywood people don't want to deal with multiple creators so this just says you don't own invincible.' I took your word for it and thought nothing more if it. Then, we talked *8 years ago* or whenever that was and I referenced the money you gave me for the mtv motion comic. I said 'you gave me my share for that' and you said, 'that wasn't your share, that was a bonus, you signed that work for hire agreement, remember?'. *So that's what I mean by you tricking me into signing it*."  UF Nos. 32-37.

**F.**     **Crabtree Is Aware Of, But Is Not Paid A Share Of Profits On, Various Types Of *Invincible* Books And Branded Products**

Crabtree also was aware of the sale of products based on *Invincible* for which he did not receive any share of profits.  For example, in 2006, Kirkman sent Crabtree emails about toys based on an *Invincible* character.  UF No. 38.

Crabtree was also aware of hardcover versions and collections of *Invincible* comic books.  Crabtree colored the cover of several of the hardcover editions.  A 2009 email shows Crabtree emailing Kirkman and Ryan Ottley (the artist who replaced Walker on *Invincible*) and asking when Kirkman wanted Crabtree to be

-17-
JOINT BRIEF RE KIRKMAN MSJ

1  done coloring the covers for the hardcovers.  UF No. 39.  Crabtree also provided

2  photographs for the biographical section. UF No. 40.

3          Crabtree testified at his deposition about categories of payments he received

4  on *Invincible* and did not mention being paid for toys. UF No. 41. Crabtree also

5  testified repeatedly at his deposition that he was not given and had not been paid

6  royalties for trade paperbacks or hardcovers.  UF No. 42.

7          **G.      Crabtree Files Suit**

8          On January 9, 2022, Crabtree sued, alleging claims for declaratory relief,

9  promissory fraud, breach of oral contract, common count, and accounting.  UF No.

10  43.

11  **3.    LEGAL STANDARDS**

12         A party may move for summary judgment, identifying each claim or defense

13  – or the part of each claim or defense – on which summary judgment is sought."

14  Fed. R. Civ. P. 56(a).  A motion for summary judgment must be granted where

15  there is "no genuine dispute as to any material fact" and the moving party "is

16  entitled to judgment as a matter of law."  Fed. R. Civ. Proc. 56(a).

17         Each of Crabtree's claims are barred by the respective statute of limitations.

18  **4.    ARGUMENT**

19         **A.      Crabtree's Copyright Claims Are Barred By The Three-Year**

20                 **Statute Of Limitations**

21         Crabtree's first claim for declaratory relief and sixth claim for accounting are

22  based on his claim to be an owner and co-creator of *Invincible*.  The statute of

23  limitations on such claims is three years.  17 U.S.C. § 507(b).  The statute of

24  limitations on claims for ownership of a copyright begins to run "three years from

25  'plain and express repudiation' of authorship."  Aalmuhammed v. Lee, 202 F.3d

26  1227, 1230-31 (9th Cir. 2000) (citation omitted).

27         Crabtree filed his lawsuit on January 9, 2022.  Therefore, his claims based on

28  co-ownership are barred if his ownership was repudiated before January 9, 2019.

1.  **Crabtree's Ownership Claim Was Plainly And Expressly Repudiated Numerous Times Starting In 2003**

Kirkman plainly and expressly repudiated Crabtree's ownership claim repeatedly long before January 9, 2019.

(a)  **Crabtree Was Never Listed As A Co-Creator Or Copyright Owner On Printed Issues Of *Invincible***

Starting with the first issue in 2003 and repeatedly thereafter with the following 143 issues, the printed copies of *Invincible* list Kirkman and Walker as creators, not Crabtree, who is listed as a "colorist" only.  Crabtree received numerous physical copies of the printed *Invincible* books that omitted listing him as a co-author.  UF Nos. 8-9, 11.  By crediting Crabtree as less than a co-creator, Kirkman repudiated Crabtree's ownership.  Aalmuhammed, 202 F.3d at 1231 ("The movie credits plainly and expressly repudiated authorship, by listing Aalmuhammed far below the more prominent names, as an 'Islamic technical consultant.'"); Silva v. Sunich, No. CV 03-9327 GPS (CWX), 2006 WL 6116645, at *7 (C.D. Cal. Sept. 6, 2006) (plaintiff's "claim was certainly repudiated in July 2000 when Defendants failed to credit Silva with Julius' creation in connection with the production of an animation series").

Likewise, Crabtree's ownership was repudiated as early as 2003 because the copyright statements on issues of *Invincible* never list Crabtree as an owner, instead listing Kirkman and Walker.  UF Nos. 10-11; Zuill, 80 F.3d at 1368 (express repudiation where copies of product included copyright notice).

(b)  **Crabtree Signed The Certificate Of Authorship, Agreeing That He Did Not Own *Invincible* And He Assigned Any Rights He May Have Had**

Crabtree's ownership was also expressly repudiated in 2005 when Kirkman gave him the Certificate of Authorship, which he signed.  The Certificate of Authorship stated that all of Crabtree's contributions were a work-for-hire, Robert

Kirkman, LLC owned all copyright to *Invincible*, and also assigned all rights Crabtree may have had in *Invincible* to Robert Kirkman, LLC.  UF Nos. 12-16.

The Certificate of Authorship clearly repudiated that Crabtree owned any part of *Invincible*.

### (c)   Kirkman Expressly Repudiated Crabtree's Claimed Ownership Interest In Writing

Kirkman repudiated Crabtree's ownership through direct communication in the March 6-7, 2012 email chain and phone call.  When Crabtree emailed Kirkman asking for his share of royalties in digital copies of *Invincible*, and Kirkman refused, stating in several different ways that Crabtree was not an owner because he was not entitled to royalties and he signed a work-for-hire agreement.  Kirkman expressly told Crabtree that:

- "You don't get any royalties on single issues past your page rate."
- "You didn't get 'your share'" of the MTV deal, "I gave you a bonus because it was an adaptation directly using your work."
- "You signed a work for hire contract on *Invincible*. I've honored that contract."
- "I'm sorry you feel that way, Bill.  But I don't owe you anything."
- "I paid you for your work and even paid you advances for years when you needed money sooner. I did right by you."
- "You did the work with the understanding that you weren't getting royalties beyond your page rate."

UF Nos. 21-24.  In written discovery responses, Crabtree admitted that during the only oral conversation he has had with Kirkman since 2009, that Kirkman reiterated that Crabtree was not entitled to royalties, had signed a work-for-hire agreement, and that prior payments to Crabtree were merely "bonuses."  UF No. 25-27.

Moreover, in Crabtree's 2020 email, he confirmed that it was *his understanding* that the 2012 communications meant that Kirkman denied his claim.

UF Nos. 32-37.  Crabtree's 2020 email tracks Kirkman's 2012 email almost verbatim.  Crabtree wrote, "we talked 8 years ago or whenever that was and I referenced the money you gave me for the mtv motion comic. I said 'you gave me my share for that' and you said, 'that wasn't your share, that was a bonus, you signed that work for hire agreement, remember?'. So that's what I mean by you tricking me into signing it."  UF No. 34.

The 2012 and 2020 emails cement Kirkman's statute of limitations defense. In plain language, Crabtree asked for royalties, and Kirkman refused to pay him as a co-author would be.  Crabtree's angry response (that Kirkman's position was "bullshit") confirms that not only was Crabtree aware of the facts of Kirkman's position, but also that Crabtree understood those facts were adverse to his ownership claim.  Silva v. Sunich, No. CV 03-9327 GPS (CWX), 2006 WL 6116645, at *7 (C.D. Cal. Sept. 6, 2006) (repudiation shown where plaintiff asked "if there was 'a way [he] could get some sort of credit or something' but the 'reaction [he] got back was not in [his] favor,'" and plaintiff later said he was "'upset that [PFI was] using characters that [he] had charged t-shirt prices for to create animated characters, without paying [him] more, or asking [his] permission'" but defendant never responded); see also Zuill v. Shanahan, 80 F.3d 1366, 1368 (9th Cir. 1996) (defendant sent putative co-owners agreement stating that defendant's company was sole owner of copyright, and noting there was no dispute by putative co-authors of that claim).

Put another way, as late as 2012 (if not earlier) Crabtree knew that Kirkman disagreed that Crabtree was entitled to royalties, Kirkman based his position on the Certificate of Authorship among other things, and Crabtree believed that Kirkman had tricked him into signing the Certificate of Authorship.  Despite that express

knowledge, Crabtree did not bring his lawsuit for over 10 years, long after the 3-year statute of limitation had passed.[3]

### (d)   Crabtree Knew About Other *Invincible* Products For Which He Was Not Being Paid A Share Of Royalties

Crabtree was also aware of merchandise based on *Invincible* for which he did not receive a "share" of royalties. Crabtree was copied on emails about *Invincible* toys, including as shown in a 2006 email, and was not paid a share of royalties from sales of *Invincible* toys.  UF Nos. 38, 41.  The failure to pay royalties constitutes express repudiation.  Seven Arts Filmed Ent. v. Content Media Corp., 733 F.3d 1251, 1257 (9th Cir. 2013) (repudiation occurred where plaintiff sent three letters demanding payment of royalties and defendant refused and continued paying royalties to parties other than plaintiff); Silva v. Sunich, No. C03-9327-GPS, 2006 WL 6116645, at *6–7 (C.D. Cal Sept. 6, 2006) (ownership claim "accrued as early as 1997 when he became aware that Defendants were selling products bearing the Julius character without paying him royalties").

Similarly, Crabtree was also aware of other written versions of *Invincible* for which he did not receive his "share" of royalties.  Zahedi v. Miramax, LLC, No. 2:20-CV-04512-MCS-E, 2022 WL 4596551, at *8 (C.D. Cal. Aug. 19, 2022) (where plaintiff "actually knew that Miramax was exploiting a photograph of which he claimed ownership without giving him credit or royalties, his failure to bring suit to assert his ownership rights is fatal to his case.").  Crabtree colored the covers for several hardcover compilations of *Invincible*, including as shown in a 2009 email. UF Nos. 39-40.  Crabtree admitted in his deposition that he knew he was not given and had not been paid royalties for trade paperbacks or hardcovers.  UF No. 42.

---

[3] Although not necessary for statute of limitations purposes, Crabtree was also aware in 2012 that he could bring a lawsuit against Kirkman for these claims. Crabtree asked whether the agreement he signed was the same agreement signed by a third party who was suing Kirkman.  UF Nos. 28-29.  Crabtree's Complaint even plays up the connection between the two lawsuits (both brought by Crabtree's attorney), alleging that they are "shockingly similar."  UF Nos. 30-31.

1                                  *      *      *

2       Therefore, Crabtree's claim to ownership of *Invincible* was repudiated in

3 numerous ways, repeatedly, starting in 2003. The three-year statute of limitation

4 has long since run. Judgment should be entered against Crabtree and for Kirkman

5 on Crabtree's first claim for declaratory relief and sixth claim for accounting.

6             **2.**     **Equitable Estoppel Does Not Save Crabtree's Claims**

7       Crabtree might contend that dismissing his copyright claims is a harsh result

8 and seek equitable tolling to relieve that burden and claim that Kirkman defrauded

9 him into signing the Certificate of Authorship. But equitable tolling does not save

10 Crabtree's claims. For starters, Crabtree's equitable tolling argument fails at the

11 start because it must be plead but was not. Fahmy v. Jay-Z, 835 F. Supp. 2d 783,

12 791 (C.D. Cal. 2011) (plaintiff must "both plead[] and prove[] that the defendant

13 actively misled her, and that she had neither actual nor constructive knowledge of

14 the facts constituting his cause of action despite her due diligence").

15       On the merits, equitable tolling also does not apply because Crabtree cannot

16 show "(1) that he has been pursuing his rights diligently, and (2) that some

17 extraordinary circumstance stood in his way and prevent timely filing.'" Kiely v.

18 Universal Music Grp., No. LACV194826MWFSSX, 2019 WL 9443183, at *4

19 (C.D. Cal. Dec. 12, 2019) (quoting Fahmy). "Equitable tolling is appropriate only

20 when 'despite all due diligence a plaintiff is unable to obtain vital information

21 bearing on the existence of his claim.'" Allan v. GreenPoint Mortg. Funding, 730

22 F.Supp.2d 1071, 1076 (N.D. Cal. 2010) (citation omitted).

23       Crabtree has in no way been diligent in pursuing his rights because he sat on

24 his hands for at least a decade after the facts underlying his claims arose. There is

25 also no proof that Crabtree was unable to obtain information that was vital to his

26 claim. As discussed above, Crabtree knew all the facts long ago, not least because

27 Kirkman told Crabtree he was not entitled to profits in the 2012 email chain. UF

28 Nos. 21-37. Moreover, any alleged fraud by Kirkman is irrelevant because Crabtree

1  knew about his claims long ago separate and apart from any misrepresentation

2  because his ownership was repudiated in several ways beyond the Certificate of

3  Authorship.  There is nothing equitable about allowing him to escape the

4  consequences of his decision to not file suit before the statute of limitations passed.

5  **B.**  **Crabtree's Fraud Claims Are Barred By The Three-Year Statute**

6        **Of Limitations**

7  Crabtree's second claim for promissory fraud and third claim for declaratory

8  relief to invalidate the Certificate of Authorship are also barred by the three-year

9  statute of limitations, which begins to run upon the "discovery, by the aggrieved

10  party, of the facts constituting the fraud."  Cal. Code Civ. Proc. § 338(d).

11  Crabtree's fraud claim alleges that, in July 2005, Kirkman presented the

12  Certificate of Authorship to Crabtree and "falsely told Crabtree that his rights and

13  financial interest in the Work would remain unchanged if he signed the Certificate

14  of Authorship and that the document would simply allow Kirkman to market the

15  licensure of the Work more easily, resulting in greater profits for both of them."

16  Complaint ¶ 36.  Crabtree alleged that he "signed the Certificate of Authorship,

17  understanding that, based on Kirkman's representations, Crabtree's ownership of

18  the Work and financial interest therein remained unchanged and that the document

19  was a ***mere formality***."  Complaint ¶ 37 (emphasis supplied).

20  Crabtree will likely argue he did not discover Kirkman's supposed fraud until

21  2020 (meaning that Crabtree was unaware that Kirkman disputed Crabtree's

22  version of the alleged contractual right to be paid a share of royalties on *Invincible*).

23  Crabtree's argument fails.

24  "The discovery rule only delays accrual until the plaintiff has, or should

25  have, inquiry notice of the cause of action" and "plaintiffs are required to conduct a

26  reasonable investigation after becoming aware of an injury and are charged with

27  knowledge of the information that would have been revealed by such an

28  investigation." Fox v. Ethicon Endo-Surgery, Inc., 35 Cal. 4th 797, 807-08 (2005).

In his Complaint, Crabtree alleged that he "did not discover Kirkman's July 2005 representations were false when made until August 2020 when Kirkman shockingly denied and repudiated them."  Complaint ¶¶ 29, 39, n.2.   Crabtree's claim of delayed discovery is demonstrably false.

As discussed above, Crabtree's own emails in 2012 and 2020 thoroughly dismantle his claim that he only learned of Kirkman's position in 2020.  In 2012, Kirkman expressly pointed to the Certificate of Authorship as one of the reasons why Crabtree was not entitled to a share of royalties and that Crabtree had been paid all he was owed.  UF No. 22.  In 2020, Crabtree's email to Kirkman recounted the 2012 exchange and Kirkman's denial, and Crabtree concluded by summing up his understanding of the 2012 exchange by saying "that's what I mean by you tricking me into signing" the Certificate of Authorship.   UF No. 34. Crabtree thus admits that he knew all of the facts giving rise to his fraud claim in 2012:

- Crabtree knew that Kirkman intended to rely upon the Certificate of Authorship – it was not a "mere formality."
- Crabtree admitted that the 2012 email exchange was why Crabtree felt he had been tricked into signing the Certificate of Authorship.
- Crabtree knew that Kirkman considered the payment on the MTV project to be a bonus, not a share of royalties, because the MTV motion comic used pages colored by Crabtree.

UF Nos. 21-37.  These were not new facts or developments in 2020.  Crabtree's claim to have been "shocked" in 2020 by Kirkman's position is bogus.

Crabtree's fraud claims were brought well over three years after the facts underlying them were discovered.  Kirkman is entitled to judgment on those claims.

**C.**     **Crabtree's Breach Of Contract Claim Is Barred By The Two-Year Statute Of Limitations**

Crabtree's fourth claim for breach of oral contract and fifth claim for common count, money had and received, are barred by a two-year statute of limitations.  Cal. Code Civ. Proc. § 339(1).

Crabtree contends that he had an oral contract on *Invincible* to be paid "twenty percent (20%) of single issue sales of the Work with a minimum of $40 per page and ten percent (10%) of any revenues generated from other film or television commercial exploitation of the Work together with any derivative projects based on the Work and any allied or ancillary rights in the Work."  Complaint ¶ 28. Crabtree's claims for breach of that contract accrued well over two years before the Complaint was filed.[4]

As discussed above, Kirkman expressly told Crabtree that he did not owe Crabtree anything, Crabtree was not previously paid a share of royalties for the MTV deal because it used pages colored by Crabtree, and Kirkman would not pay him a share of royalties in 2012 for the digital comics.  UF Nos. 21-37.  This express repudiation of Crabtree's understanding of the agreement started the statute of limitations clock running at the very latest in 2012, meaning it expired in 2014.

To try to get around the statute of limitations, Crabtree will likely argue that there were earlier breaches of this supposed contract that should vitiate the statute of limitations under the continuous violation or continuous accrual doctrines but neither applies.  The continuous violation doctrine applies where "injuries are the product of a series of small harms, any one of which may not be actionable on its own" and "a pattern of reasonably frequent and similar acts" that can be treated "as an indivisible course of conduct."  Aryeh v. Canon Bus. Sols., Inc., 55 Cal. 4th

---

[4]  For purposes of this motion only, Kirkman assumes that there was an oral contract as Crabtree alleges.  Kirkman reserves the right to prove that there was no oral agreement as Crabtree for all purposes outside of this motion.

1185, 1198 (2013).  But here, Crabtree's alleged injuries were not small or unactionable on their own.  Crabtree could have sued for failure to pay royalties when they were not paid.  Nor are the supposed breaches sufficiently frequent or similar.  Crabtree's Complaint alleges that there were "repeated and ongoing payments" of royalties per the oral agreement (Complaint ¶ 28) but that is mere wishful thinking in an attempt to conjure up an escape from the statute of limitations defense.  The Complaint cites to only two payments to Crabtree but neither were for royalties: the Paramount deal from 2005, and the MTV deal from 2007.  Complaint ¶ 28. The continuing violation doctrine does not apply to such "discrete" alleged wrongs.  Aryeh, 55 Cal. 4th at 1198.

The theory of continuous accrual would apply to contracts "where performance of contractual obligations is severed into intervals," such as "leases with periodic rental payments," and "contracts calling for periodic, pension-like payments on an obligation with no fixed and final amount."  Armstrong Petroleum Corp. v. Tri–Valley Oil & Gas Co., 116 Cal. App. 4th 1375, 1388-89 (2004).  Again, this doctrine does not apply because there were no recurring payments.  These sporadic, random payments are entirely different from a situation where there are regular divisible payments, like monthly payments for a lease.  Garrison v. Oracle Corp., 159 F. Supp. 3d 1044, 1084 (N.D. Cal. 2016) (noting continuing accrual doctrine typically applied in cases involving monthly bills, monthly rent, or monthly lease payments); Al-Ahmed v. Twitter, Inc., 603 F. Supp. 3d 857, 879 (N.D. Cal. 2022) (continuous accrual doctrine did not apply because there were only two potential breaches that were "discrete and independent transactions").

Thus, there are no recurring obligations and the continuous violation and accrual doctrines do not apply.  Crabtree's breach of contract and derivative common count claim are barred by the statute of limitations and judgment should be entered for Kirkman.

**D.**     **Crabtree's Declaratory Relief Claim About The Meaning Of The Certificate Of Authorship Is Also Time Barred**

Crabtree's third claim for declaratory relief includes the request for a declaration that, the Certificate of Authorship lacks consideration but, if the Certificate of Authorship is found to be valid, then it applies only to motion picture adaptations of *Invincible*.  Complaint ¶ 45.  This claim is essentially a breach of written contract claim so a four-year statute of limitations applies.  Corley v. FedEx Ground Package Sys. Inc., No. 519CV00429OD-WSHKX, 2020 WL 1652547, at *4 (C.D. Cal. Mar. 2, 2020) ("The duration of the limitations period applicable to a declaratory relief action is determined by the nature of the underlying obligation sought to be adjudicated.") (citing Snyder v. Cal. Ins. Guar. Ass'n, 229 Cal. App. 4th 1196, 1208 (2014)); Cal. Code Civ. Proc. § 337.

First, Crabtree's claim that the Certificate of Authorship lacked consideration is barred.  Crabtree kept coloring *Invincible* long after signing the Certificate of Authorship.  UF No. 16.  And he failed to sue Kirkman for over a decade after Kirkman's 2012 email made clear that Kirkman was refusing to pay royalties in the past or future based on the Certificate of Authorship. This claim is time-barred.

Second, Crabtree's contention that the Certificate of Authorship applies only to motion pictures such that he is owed royalties for all non-motion picture *Invincible* properties is also barred.  Crabtree knew that the Certificate of Authorship did not apply only to motion picture adaptations of *Invincible* because he knew about non-motion picture *Invincible* products like the toys, and the digital comics and MTV motion comic he emailed about in 2012 when Kirkman expressly told Crabtree that he was not paid a share of royalties for either.  UF Nos. 38-42.

Therefore, any claim that the Certificate of Authorship should apply to only motion picture adaptations of *Invincible* accrued long ago when Kirkman expressly and repeatedly disagreed with Crabtree's interpretation and refused to and never

1   performed according to it.  Judgment should be entered against Crabtree and in
2   favor of Kirkman on this claim as well.

3       **E.**    **Kirkman Is Entitled To Partial Summary Judgment That**
4           **Crabtree Is Not Owed Royalties On Sales Of Trade Paperbacks**

5         Finally, and in the alternative, if the Court does not grant summary judgment,
6   the Court should grant partial summary judgment that Crabtree is not owed any
7   royalties on the sales of trade paperbacks.  Fed. R. Civ. Proc. 56(a) (summary
8   judgment may be had as to a "part of" a claim).  At his deposition, Crabtree
9   repeatedly testified that he understood that he was not entitled to be paid a share of
10  royalties on sales of trade paperbacks.  UF No. 42.  In the alternative if summary
11  judgment is not granted, the Court should grant partial summary judgment and find
12  that Crabtree is not owed royalties on sales of trade paperbacks.

13  **5.**    **CONCLUSION**

14        Therefore, there are no material disputes of fact that all of Crabtree's claims
15  are barred by the statute of limitations, and summary judgment or, in the alternative
16  partial summary judgment, should be entered against Crabtree and in favor of
17  Kirkman, and Kirkman should be allowed to move for attorneys' fees and costs.

## **CRABTREE'S OPPOSITION BRIEF**

### **PLAINTIFF WILLIAM CRABTREE'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

## I.    **INTRODUCTION**

Defendants Robert Kirkman and Robert Kirkman, LLC's (collectively "Kirkman") entire motion for summary judgment rises and falls on the interpretation of a March 2012 email chain between Kirkman and Plaintiff William Crabtree. Kirkman advances a strained, unreasonably expansive interpretation of this email chain, claiming that it represents a complete and total repudiation of the parties' agreement underlying this action and triggering the statute of limitations on all of Crabtree's claims.   However, Kirkman ignores (and does not even provide to the Court), Crabtree's deposition testimony on this very email chain wherein Crabtree explained the very limited, innocuous and completely sensible meaning of the communications, being limited to a discrete sub-category of royalties not contemplated at the time of original contracting, completely undermining Kirkman's statute of limitations argument.[5]    (UF #62-68.)    Even indulging Kirkman's unreasonable interpretation of the 2012 email chain, Kirkman's motion would require this Court to completely disregard Crabtree's deposition testimony on this issue.    There is, at a minimum, a genuine issue of material fact that precludes summary judgment in this case.

In addition to the failure of this tent-pole issue that is a central element of each of Kirkman's arguments, Kirkman's ancillary arguments all also fail as well and are either belied by the law or disputed issues of fact.   Kirkman's motion further fails as a threshold matter because it was brought far too late in this case and has a hearing

---

[5] For example, Kirkman fails to include the following testimony: **Q.**  And on the basis of these communications in 2012, did you conclude that Mr. Kirkman was repudiating that deal he made with you concerning your compensation on Invincible?  **A.**  No.  (UF #66 [Crabtree DT 153:10-14].)

date set nearly two months after the deadline set in the Scheduling Order.  Thus, the Court need not even reach the merits of Kirkman's motion and can deny it on these grounds alone.

**II.      STATEMENT OF DISPUTED FACTS**

> **A.      Crabtree, Kirkman And Cory Walker Co-Create The Work And Agree To Compensation Terms**

In the early 2000's, Kirkman, Crabtree and Cory Walker collaborated to co-create the comic and graphic novel series *Invincible*.  (UF #44-47.)  The Work tells the coming of age story of an eponymous superhero.  The series gained critical acclaim and a devoted following as a result of the juxtaposition of extreme graphic violence with beautifully rendered and richly colored artwork and visuals.

At the outset, Kirkman and Walker provided the plot, characters, dialogue, themes, sequence of events and the drawings, and Crabtree the color, and with that, the setting, costumes, mood, and overall look and feel.  (UF #44-47.)  This collaboration turned into finished comic books, expressing the three authors' ideas through the collaborative combination of artwork, coloring and accompanying text.  (*Id.*)  Walker ceased participation on the Work after Issue No. 7 and was replaced by a new artist.

Crabtree, Walker and Kirkman eventually jointly authored the Work, with Walker creating the artwork, Crabtree creating the coloring and certain other artistic elements and Kirkman providing the accompanying text on the canonical first 50 issues of the series.  (UF #44-47.)  Aside from jointly masterminding with Kirkman and Walker the foundational elements of the series, Crabtree's artistic contributions provided, among other things, the "look" and "feel" of the Work – a critically important element in intensely visual works such as comic books.  (UF #47.)  As Crabtree testified, his color work on Invincible "was to present things in an aesthetically pleasing way that would communicate the narrative and support the narrative but also, kind of, showcase the very clean, intentionally spare artwork."

1
2
3
4
5

(UF #47 [Crabtree DT 66:16-20].)   Crabtree made deliberate and specific color choices in his own discretion, including as to the specific color schemes and arrangements for characters.  (UF #47 [Crabtree DT 71:2-75:18]).  Crabtree's credit on the Work was featured prominently on the cover at equal billing and equal prominence to Kirkman and Walker – as but one example on Issue No. 1:




1    (Scott Decl. Ex. 21.)

2         In recognition of Crabtree's co-authorship and co-ownership of the Work,

3    Kirkman and Crabtree agreed that Crabtree was to receive twenty percent (20%) of

4    single issue sales of the Work with a minimum of $40 per page and ten percent (10%)

5    of any revenues generated from other film or television commercial exploitation of

6    the Work together with any derivative projects based on the Work and any allied or

7    ancillary rights in the Work.  (UF #48.)  Crabtree does not and never did contend that

8    he was entitled to royalties on so-called "trade paperbacks" of *Invincible*, which are

9    bound, reprinted, multi-issue volumes of the comic series, as opposed to single issue

10   sales.  Kirkman does not dispute that he and Crabtree had such an agreement, but

11   instead now contends that the agreement was that Crabtree was to be paid "$40 per

12   page or 20% of profits from sales of single issues of Invincible, whichever was

13   higher."  (UF #49.)

14        **B.**        **Kirkman Fraudulently Induces Crabtree To "Assign" His**

15                 **Copyright In The Works To Kirkman's Loan Out Company**

16        In July 2005, Kirkman was attempting to license television and theatrical rights

17   to certain comic series with which he was involved, including without limitation the

18   Work, as well as numerous other titles including *The Walking Dead* comic series.

19        Without any advance notice, Kirkman approached Crabtree at the 2005

20   "Comic-Con" Convention in San Diego, California and presented Crabtree with a

21   pre-printed document entitled "Certificate of Authorship," which purported to post-

22   hoc characterize all of Crabtree's contributions to the Work as a purported "work for

23   hire" – even though this was demonstrably untrue – and also assigning to Kirkman,

24   LLC all of Crabtree's copyright ownership rights in and to the Work.  (UF #50-58.)

25        Kirkman told Crabtree that Kirkman was in final stage discussions with certain

26   Hollywood studios to license the Work for television and/or theatrical production and

27   that, as per the specific request of these studios, having the Work represented by a

28   single creator would increase its commercial viability and result in higher monetary

1  benefits for both Kirkman and Crabtree.  (UF #50-58.)

2  As the document was being presented to Crabtree after his contributions had

3  already been completed on the Work and the financial arrangement had already been

4  established, Kirkman falsely told Crabtree that Crabtree's rights and financial interest

5  in the Work would remain unchanged if he signed the Certificate of Authorship and

6  that the document would simply allow Kirkman to market the licensure of the Work

7  more easily, resulting in greater profits for both of them.  (UF #50-58.)  Kirkman

8  specifically told Crabtree that Crabtree could "trust him."  Kirkman specifically told

9  Crabtree: ***"Our deal [on the Work] stays the same.  This is just for the Hollywood***

10  ***people so we can get paid."***  (UF #52.)  Crabtree was given no opportunity to have

11  the document reviewed by an attorney and Kirkman gave the impression that it

12  needed to be signed then and there right away as Kirkman was attending meetings

13  with Hollywood studios during the convention regarding the Work that would cease

14  if the document was not signed.  (UF #50-58.)  Crabtree was never provided with a

15  copy of what Kirkman had him sign.  (*Id.*)

16  Under these false pretenses, Crabtree signed the Certificate of Authorship,

17  specifically relying on the fact that, based on Kirkman's express representations,

18  Crabtree's ownership of the Work and financial interest therein remained unchanged

19  and that the document was a mere formality for Kirkman to market the Work.  (UF

20  #50-58.)  No consideration was paid to Crabtree for signing the Certificate of

21  Authorship.  (UF #56.)  Additionally, of note, and unbeknownst to Crabtree until

22  being provided with a copy in August 2020, the Certificate of Authorship was never

23  signed by Kirkman or Kirkman, LLC, which is a requirement for any work for hire

24  agreement.  (UF #57.)

25  **C.**     **Kirkman Continues To Pay Crabtree For Motion Picture And**

26  **Other Licensing Of The Work**

27  Kirkman continued to pay Crabtree per their original financial arrangement at

28  rates greater than $40 per page for single issue sales of the Work even after the

execution of the Certificate of Authorship.  (UF #16-20, 75.)  Additionally, after execution of the Certificate of Authorship, Kirkman paid Crabtree thousands of dollars in connection with licensure of the Work by MTV for a motion comic and by Paramount Pictures for an option for film and television rights on the Work.  (UF # 16-20, 75.)

Based on these repeated and ongoing payments, Crabtree believed that what Kirkman had originally stated remained true – namely, that Crabtree continued to be an owner of the Work entitled to a share of the financial proceeds generated from the exploitation thereof.  (UF #75.)  Kirkman did not provide Crabtree with accounting statements or other disclosures about revenues generated by the Work, so Crabtree relied upon Kirkman's representations to determine what royalties he was owed under the parties' agreement.  (UF #61.)

### D. Kirkman Does Not Repudiate The Parties' Agreement In The March 2012 Email Chain

In March 2012, Crabtree became aware that single issues of *Invincible* were being sold in digital format on a website called "Comixology." (UF #62.)  Crabtree felt that this format was not something that had been anticipated in the parties' original agreement in the early 2000's, as the technology did not then exist.  (UF #63.)  Crabtree's reasoning was that the digital issues were "single issues" and were not "reprints" as they were not "printed" at all and, under the terms of his agreement with Kirkman, Crabtree should receive his 20% royalty on these digital sales.  (UF #64.)

On March 16, 2012, Crabtree wrote to Kirkman via email: "hey, i see back issues are available on comixology.  shouldn't i be getting revenue for the first 50 issues that are being sold on there?  this seems similar to the mtv motion comics, which I received my share of." (UF #21.)  Kirkman responded on March 17, 2012:

The digital issues are reprints no different than the TPBs.  You don't get any royalties on single issues past your page rate.

> You didn't get 'your share' of the MTV motion comics.  I gave you a
> bonus because it was an adaptation directly using your work.  You
> signed a work for hire contract on Invincible.  I've honored that
> contract.

(UF #22.)  Crabtree testified that the MTV motion comic issue was germane to the

digital prints, as they were an analogous format and Crabtree had been paid on the

MTV motion comics:

> I basically felt this [digital prints] was an issue that hadn't been
> anticipated in our initial agreement, and I thought it was right that we
> would, you know, negotiate this, and I said, "What about the digital
> motion comic that MTV made?  That was, you know, using my work
> in a digital platform and you gave me my, you know" – well, I don't
> know the actual amount, but I assume that was my 20 percent on that
> because it's the same thing as the – you know, it's not in print.  It's –
> you know, I thought that there was some [parity] there between what I
> was requesting in the form of digital comics and this other, sort of
> digital comic, and he didn't agree with me.

(UF #63-64; Scott Decl. Ex. 14 [Crabtree DT 54:19-7].)

As to Kirkman's statement that he had "honored that agreement," Crabtree

testified that he considered Kirkman to ***affirming*** the parties' agreement, but just that

the two had a disagreement as to the discrete issue on digital single issue sales:

> In that conversation, he said that he honored his deal with me, and at
> the time I thought, "Yeah, you have honored your deal so far with me,'
> because he had given me my portion of the Paramount option.  I didn't
> agree that the digital comic did not fall under our deal, but everything
> else I felt yeah, okay.

(UF #65-68; Scott Decl. Ex 14 [Crabtree DT 55:20-56:1; 119:17-121:7].)

At his deposition, Crabtree was specifically asked about the March 2012 email

exchange and his interpretation of the discussion at the time:

> **Q.**  Earlier, you were testifying about a 2012 communication you had with
>      Mr. Kirkman concerning your compensation on Invincible.   Is this

1    [Exhibit 21] what you were referred to?

2  **A.**  Yes.

3  **Q.**  And at the time you were having these communications that are
4        embodied in this email here Exhibit 21, what was your understanding of
5        your deal with Mr. Kirkman concerning your compensation on
        Invincible?

6  **A.**  As I said, my understanding was that I would receive 20 percent of
7        single-issue sales or $40 per page, whichever was higher, and that I
        would get 10 percent of any exploitation of the IP.

8  **Q.**  And on the basis of these communications in 2012, did you conclude
9        that Mr. Kirkman was repudiating that deal he made with you concerning
        your compensation on Invincible?
10

11  **A.**  No. [Objection]

    **Q.**  Why not?  I'm asking you why not.  Why did you conclude he was not
12        repudiating the deal?

13  **A.**  Well, he said he would honor our deal.

14  **Q.**  And so what was the dispute about?

15  **A.**  Oh, well, I – I maintain that there is definitely something worth looking
        at in terms of our deal being I get 20 percent of single-issue sales and I..
16        or $40 a page, blah, blah, blah, but I don't get reprint royalties, right?

17        And, to me, when you publish a digital comic and it's available for sale
18        in single issues and it's not in print, literally not in print, it's digital, I
        felt, and to this day maintain, that that was something neither one of us
19        anticipated one way or another back in 2002, or whenever we made our
        agreement.
20

21        I thought it was worth, you know, asking him about, because I was just
        looking for an honorable way for him to give me some royalties on – on
22        the comic, not just, you know, the single issue sales and the IP
        exploitation.
23

24  **Q.**  So your dispute here with Mr. Kirkman was what bucket do digital issues
        fall within, excluded reprints or single sales?
25

    **A.**  Yes.
26

27  (UF #65-68; Scott Decl. Ex. 14 [Crabtree DT 152:21-154:17].)

28

The March 2012 email chain contained no discussion about Crabtree's copyright ownership in the Work as a whole or his entitlement to motion picture or television royalties. (UF #68.)  It was exclusively limited to digital issue sales. (UF #65.)  Kirkman and Crabtree had a telephone call immediately after this email exchange in March 2012, wherein Kirkman still would not agree to pay royalties to Crabtree on the digital issue sales, but stated he would try to get Crabtree colorist work on other projects because he "felt bad". (UF #69.)  This additional work never materialized, however.  (*Id.*)

E.   **Crabtree Learns Of The Amazon Prime Series And Finally Receives A Copy Of the Certificate Of Authorship In August 2020**

In August 2020, Crabtree learned that Amazon Prime was moving forward on its plan to launch an episodic series based on the Work.  (UF #70.)  Crabtree promptly contacted Kirkman to discuss the particulars of the series and the license with Amazon Prime, but Kirkman ignored Crabtree's communications.  (UF #71.)  When Crabtree was finally able to communicate with Kirkman between August 26 and 31, 2020, Kirkman repudiated the representations he made to induce Crabtree's signature on the Certificate of Authorship 16 years prior and informed Crabtree that Kirkman LLC was the sole owner of the Work, that Crabtree had no ownership interest and was not entitled to any monetary proceeds generated from the Work as a result of the Certificate of Authorship.  (UF #71.)  Crabtree also requested and was finally provided with a copy of the Certificate of Authorship in August 2020.  (UF #72.)  Upon review of the Certificate of Authorship and after hearing Kirkman's repudiation of their agreement, Crabtree recognized that Kirkman had defrauded him into signing the Certificate of Authorship and that the document may not be valid on its face.

After attempting in vain to negotiate a pre-litigation resolution with Kirkman, Crabtree was forced to file this lawsuit in U.S. District Court for the Central District of California on January 9, 2022.

### III.   LEGAL STANDARD

At summary judgment, a court's function is not to weigh the evidence and determine the truth, "but to determine whether there is a genuine issue for trial." *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The evidence of the nonmovant is "to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. The moving party bears the initial burden of showing that there is an absence of a genuine issue of material fact and that it is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). Only when such a showing is made, does the burden shift to the opposing party, who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256. To establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 631 (9th Cir. 1987).

### IV.   ARGUMENT

#### A.   Kirkman's Motion for Summary Judgment Is Procedurally Defective As It Does Not Comply With The Scheduling Order

The Court issued its Scheduling Order on July 25, 2022, which set the final date for motions for summary judgment to be heard as June 1, 2023. Kirkman set the hearing date for this Motion for July 27, 2023 – nearly two months past the cut-off date. As set forth in greater detail in Crabtree's Opposition to Kirkman's Ex Parte Application to Modify the Scheduling Order (ECF #26), Kirkman has not been diligent in prosecuting this case and there is no basis for the Court to modify the Scheduling Order to allow Kirkman's Motion to be heard past the cut-off date. Although the Motion is completely without any legal merit, it can and should be denied at the outset for failure to comply with the Scheduling Order.

**B.**     **Crabtree's Copyright Claims Are Not Barred By The Three Year Statute Of Limitations And Disputed Facts Abound**

     **1.**     **There Has Never Been An Express Repudiation Of Crabtree's Copyright Ownership In The Work**

Civil copyright claims have a three year statute of limitations under 17 U.S.C. § 507(b). A "plain and express repudiation" of copyright ownership triggers a three-year statute of limitations, *at least where the parties are in a close relationship*. *Zuill v. Shanahan*, 80 F.3d 1366, 1369 (9th Cir. 1996) (emphasis added). "There is no comprehensive list of the types of statements or activities that constitute 'plain and express' repudiation." *Ford v. Ray*, 130 F. Supp.3d 1358, 1361 (W.D. Wash 2015). The inquiry is "fact-intensive" and the communication must be "plain and express – meaning that there is *no room for divergent interpretations*." *Pisciotti v. Brittingham*, 2022 WL 2392198, *12 (W.D. Wash. July 1, 2022) (citing *Zuill*, 80 F.3d at 1368)) (emphasis added).

Initially, Kirkman's Motion completely ignores and fails to make any showing of the first prong of the analysis – that of a "close relationship."[6] Without demonstrating this fundamental element of the express repudiation defense, Kirkman's Motion fails at the outset. *See S. Cal. Gas. Co. v. City of Santa Ana*, 336 F.3d 885, 888 (9th Cir. 2003) (summary judgment movant with burden at trial "must establish beyond controversy every essential element" of claim or defense). Further, Kirkman simply does not and cannot demonstrate any express repudiation by Kirkman of Crabtree's copyright ownership in the Work.

---

[6] Kirkman's citation to *Aalmuhammed v. Lee*, 202 F.3d 1227, 1230-31 (9th Cir. 2000) in his Motion leaves out the important subsequent circumscription of *Aalmuhammed* that the repudiation rule applies only to parties who "are in a close relationship." (*Seven Arts Filmed Entm't, Ltd. v. Content Media Corp, PLC*, 733 F.3d 1251, 1256-58 (9th Cir. 2013) ("Extending [the] accrual rule to encompass claims against those who are not in a close relationship could introduce uncertainty into the enforcement of copyrights ….")

a.   **The Printed Issues Of The Work Do Not Constitute An Express Repudiation And List Crabtree On Equal Billing With Kirkman**

Kirkman first argues that Crabtree's copyright ownership was repudiated because the printed issues of the Work identify "Kirkman and Walker as creators, not Crabtree, who is listed as a 'colorist' only." This argument fails.

Initially, even if Kirkman's factual assertions were correct (and they are not, as explained immediately below), an express repudiation has not occurred. "[W]here copyright ownership in a work is disputed, the release of the work without crediting one of the disputed authors may not *per se* establish express repudiation." *Robertson v. Burdon*, 2019 WL 2141971, at *13 (C.D. Cal. Apr. 3, 2019) (release of album cover exclusively referencing defendant as song writer on songs as to which copyright was disputed insufficient to constitute express repudiation); *Donen v. Paramount Pictures Corp.*, 2008 WL 5054340, at *5 (C.D. Cal. Nov. 20, 2008) (rejecting argument that release of motion picture without reference to plaintiff in credits constituted express repudiation); *Scorpio Music (Black Scorpio) S.A. v. Willis*, 2013 WL 790940, at *6 (S.D. Cal. Mar. 4, 2013) (rejecting the mere filing of copyright registrations listing defendant as an author and the release of records bearing labels identifying defendant as an author as rising to the level of "plain and express repudiation" communicated to plaintiff).[7]

Here, the mere alleged failure to credit Crabtree (which is factually untrue, as explained below) does not in and of itself establish an express repudiation. Further, while Kirkman argues that Crabtree received physical copies of the printed issues of the Work, Kirkman does not establish **when** these were received by Crabtree and thus does not establish that the statute of limitations began to run more than three

---

[7] *See also Kiely v. Universal Music Group,* 2019 WL 9443183, at *4 (C.D. Cal. Dec. 12, 2019) ("…courts in this Circuit have typically required more than a copyright registration or the public dissemination of a product with a printed copyright notice to trigger the limitations period.")

years prior to the commencement of this action – *i.e.* if Crabtree received these printed copies of the Work within the three year period prior to filing this lawsuit, they would be immaterial to any statute of limitations argument. Kirkman simply presents no evidence on the issue and, thus, does not meet his burden.

Second, Kirkman's factual assertions are untrue. The credits on the interior inset pages submitted with Kirkman's motion identify with equal billing: Robert Kirkman, Writer, Letter; Cory Walker, Penciler, Inker; Bill Crabtree, Colorist. (Kirkman Decl., Ex. 1.) Crabtree's contributions to the Work were billed and credited in identical size font, location and prominence as those of Kirkman and Walker. (*Id.*) While these credit pages also have an additional credit to Kirkman and Walker as "Co-Creators," this is a different and distinct designation from a copyright holder. Obviously, one need not be a "co-creator" of a work in order to have a copyright interest in the Work. Further, Kirkman fails to provide the Court with the covers of these issues, which all identify "Kirkman • Walker • Crabtree" in equal font and in equal prominence on the page and without specifying the respective contributions of each to the Work; instead listing them as equal co-contributors. (UF #73-74.) Indeed, the recent reprints of the Work used and sold as promotional materials for the *Invincible* Amazon Prime Series in 2021 have covers that attribute the Work to "Kirkman Walker Crabtree" all in equal size font and of equal prominence. (UF #74.)

The cases cited by Kirkman in support this argument are inapposite. For example, in *Aalmuhammed*, 202 F.3d at 1231, the plaintiff's identification in the movie credits was "far below the more prominent names" – which is not the case here, with Crabtree receiving equal prominence with that of Kirkman. Additionally, the Court in *Aalmuhammed* did not even rely on this issue in reaching its conclusion, as the credits were issued less than three years before the lawsuit was filed and the issue is, thus, non-binding dicta. *Id.* 1231. Additionally, in *Silva v. Sunich*, 2006 WL 6116645 (C.D. Cal. Sep. 6, 2006), the Court found express repudiation where

an artist received ***no credit or attribution at all*** and contemporaneously asked defendant for credit and copyright ownership and was expressly told "no" by the defendant.  *Id.* at *6.  This is far different from the instant case where Crabtree received equal billing and prominence along with Kirkman and continued to receive royalty payments as if he were a copyright holder and pursuant to the parties' agreement.

### b. The Certificate Of Authorship Is Legally Invalid And Was Procured Through Fraud

Kirkman next argues that the Certificate of Authorship constitutes an express repudiation because it purports to characterize Crabtree's contributions to the Work as a work for hire.  The problem with this argument is that (1) the Certificate of Authorship was procured through fraud, with Kirkman expressly telling Crabtree that the Certificate of Authorship was just a formality and that their "deal would not change" and (2) the Certificate of Authorship is void ab initio as a work for hire agreement under 17 U.S.C. § 101(2) because it is not signed by Kirkman and was created after Crabtree had *already* made his contributions to the Work.

First, the Certificate of Authorship was procured through fraud by Kirkman and was only signed by Crabtree due to Kirkman's representation at the time that Crabtree's rights in the Work and the parties' financial arrangement would not change and that the document was simply a formality to market the Work to Hollywood studios.  (UF #50-58.)  As Kirkman told Crabtree: "Our deal [on the Work] stays the same.  This is just for the Hollywood people so we can get paid." (UF #52.)  Kirkman cannot now try to use the Certificate of Authorship as a repudiation of Crabtree's copyright interests when Kirkman expressly told Crabtree at the time of execution that it was ***not*** a repudiation and that their "deal stays the same."

Second, the Certificate of Authorship is not a valid "work for hire" agreement in any event.  17 U.S.C. § 101(2) provides that a "work made for hire" is "a work

specially ordered or commissioned for use as a contribution to a collective work, as part of a motion picture or other audiovisual work, as a translation, as a supplementary work, as a compilation, as an instructional text, as a test, as answer material for a test, or as an atlas, ***if the parties expressly agree in a written instrument signed <u>by them</u> that the work shall be considered a work made for hire.***" (Emphasis added).  The phrase "signed by them" requires that **both** parties must sign any purported work for hire agreement for the document to be effective.  *See Schiller & Schmidt, Inc. v. Nordisco Corp.*, 969 F.2d 410, 412 (7th Cir. 1992).  Additionally, any such work for hire agreement must "precede the creation of the property…"  *Id.* at 412-413.  It is undisputed that Kirkman never signed the Certificate of Authorship and that it was not signed by Crabtree until long after creation of the Work.  (UF #57-58.)   The invalid Certificate of Authorship cannot constitute an express repudiation.

        c.      <u>**The March 2012 Emails Do Not Constitute A Repudiation Of Crabtree's Copyright Interest**</u>

Kirkman next relies on the March 2012 email chain wherein Kirkman claims that there was an express repudiation of Crabtree's rights to royalties from the Work.  Kirkman completely misrepresents the content of this email chain, which was related exclusively to royalties owed on a single category of exploitation of the Work – digital reprints of single issues – and whether those constituted excluded reprints or single issue sales under the parties' oral agreement.  (UF #65.)  The email chain **does not** relate to royalties owed or copyrights owned as to the Work as a whole.  (UF #66.)   As Crabtree testified, the March 2012 emails actually reflect Kirkman ***ratifying*** the parties' agreement and Crabtree's rights, with Kirkman stating that Crabtree had signed a "work for hire agreement" and that Kirkman had "honored that contract," by – per Crabtree's interpretation – paying Crabtree royalties on single issue sales and other intellectual property exploitation such as the Paramount option and the MTV motion comic.  (UF #66-67.)  There was no express repudiation – and

1   certainly not one in which there were "no room for divergent interpretations."

2       The August 2020 emails exchanged between Crabtree and Kirkman simply

3   reference this March 2012 conversation and reflect Crabtree's request to obtain a

4   copy of the purported "work for hire agreement" that Kirkman had referenced so that

5   Crabtree could review it in light of the recently announced Amazon Prime *Invincible*

6   series.   The August 2020 emails were sent well within the statute of limitations

7   period and do not implicate the statute of limitations at all.

8               d.      **The Sale Of Other *Invincible* Products Does Not**

9                       **Constitute A Repudiation**

10      Kirkman finally argues that the sale of *Invincible* toys and other written

11  versions of *Invincible* constitutes a repudiation, as Crabtree was not paid royalties

12  on these items.   Initially, the mere sale of these items does not constitute a

13  repudiation.   As a joint owner of the copyright, Kirkman possesses a non-exclusive

14  license in the Work that would entitle him to sell these other items without negating

15  Crabtree's ownership interest.   1 Nimmer on Copyright § 6.10.   Second, Kirkman's

16  non-payment of royalties to Crabtree on these items does not constitute an express

17  repudiation.   With respect to the hardcover compilations of *Invincible*, Crabtree

18  never claimed to be entitled to royalties on these items as they constitute trade

19  paperbacks – not single issue sales.   (UF #48.)   Thus, Crabtree never had any

20  expectation to receive royalties on these items and the non-payment of royalties on

21  these items was entirely in keeping with the parties' agreement.   With respect to the

22  sales of *Invincible* toys, Kirkman has not produced any evidence that there ever were

23  sales of *Invincible* toys.   The 2009 email he references simply shows a prototype of

24  an action figure.   (Kirkman Decl. Ex. 3.)   There is no reference to these toys ever

25  being sold or revenue being generated from them – and certainly no evidence that

26  Crabtree ever had any knowledge of such.   (*Id.*)   This cannot constitute an express

27  repudiation.

28

1
2

**2.      The Statute Of Limitations Was Equitably Tolled Because Kirkman Lulled Crabtree Into Inaction**

3      Kirkman argues that equitable tolling and/or equitable estoppel does not apply
4  here to toll the statute of limitations on Crabtree's copyright claims.  Although the
5  Court need not reach this issue because this case filed well within the statute of
6  limitations period, Kirkman is simply wrong and numerous facts exist that support
7  the application of equitable tolling.  "A limitations period may be tolled when 'the
8  complainant has been induced or tricked by his adversary's misconduct into allowing
9  the filing deadline to pass.'"  *Seven Arts Filmed Entertainment Limited v. Content*
10  *Media Corp., PLC*, 2011 WL 13143546, at *7 (C.D. Cal. Oct. 3, 2011) (quoting
11  *Supermail Cargo, Inc. v. United States*, 68 F.3d 1204, 1207 (9th Cir. 1995)).
12  "…[T]he doctrine of equitable tolling, as it has been applied in copyright claims, has
13  typically involved allegations of inequitable conduct by the defendant …."  *In re*
14  *Napster, Inc. Copyright Litigation*, 2005 WL 289977, at *5 (N.D. Cal. Feb. 3, 2005).

15      Here, Kirkman induced Crabtree to execute the Certificate of Authorship by
16  telling him that the document was merely a formality, stating: "Our deal [on the
17  Work] stays the same.  This is just for the Hollywood people so we can get paid."
18  (UF #52.) Kirkman continued to perform on the agreement with Crabtree long after
19  it was signed, paying him his royalty rate on single issue sales and paying him
20  royalties in connection with licensure of the Work on the Paramount deal and the
21  MTV motion comic deal.  (UF #16-20, 75.)  Kirkman did not provide Crabtree with
22  income statements or other reports as to sales of other commercial exploitations of
23  the Work, so Crabtree had no reason to believe he was not receiving all royalties due
24  him under the agreement and as a copyright holder.  (UF #61.)

25      It was not until Crabtree saw promotional materials for the Amazon Prime
26  *Invincible* series in August 2020 and Kirkman told Crabtree that he would not pay
27  him royalties in connection therewith and expressly repudiated Crabtree's copyright
28  interest in the Work.  (UF #70-71.)  Crabtree filed suit in January 2022, well within

the limitations period.  Kirkman lulled Crabtree into inaction by affirmatively telling Crabtree that the Certificate of Authorship would have no impact on their deal or Crabtree's copyright ownership interest, continuing to pay Crabtree royalties and otherwise not disclosing other commercial exploitation of the Work.  The statute of limitations should be equitably tolled until at least August 2020, when Crabtree learned that Kirkman was refusing to pay royalties on the Amazon *Invincible* series.

**C.**   **Crabtree's Fraud Cause Of Action Is Not Barred By The Statute Of Limitations**

Longstanding California authority protects defrauded individuals from the harshness of statutes of limitations for fraud when the facts regarding the fraud are concealed, or the fraudster lulls the defrauded person into inaction.  As the California Supreme Court stated long ago in *Victor Oil v. Drum*, 184 Cal. 226, 241 (1920):

> The Courts will not lightly seize upon some small circumstance to deny relief to a party plainly shown to have been defrauded against those who have defrauded him on the ground, forsooth, that he did not discover the fact that he had been cheated as soon as he might have done. It is only where the party defrauded should plainly have discovered the fraud except for his own inexcusable inattention that he will be charged with discovery in advance of actual knowledge on his part.[8]

The general doctrine of equitable estoppel has been codified in California as follows: "Whenever a party has, by his own statement or conduct, intentionally and deliberately led another to believe a particular thing true and to act upon such belief, he is not, in any litigation arising out of such statement or conduct, permitted to contradict it."  Cal. Evid. Code § 623.  "[O]ne cannot justly or equitably lull his

---

[8] *See also Laraway v. First Nat'l Bank of La Verne*, 39 Cal. App. 2d 718, 728 (1940) ("Courts will not put their imprimatur upon a possible but antiquated authority that a person must assume that everyone with whom he had a business transaction is a rogue and act accordingly, but rather will hold that one can act upon the presumption that there exists no intention to cheat and defraud him.").

1  adversary into a false sense of security, and thereby cause his adversary to subject

2  his claim to the bar of the statute of limitations, and then be permitted to plead the

3  very delay caused by his course of conduct as a defense to the action when brought."

4  *Lantzy v. Centex Homes*, 31 Cal. 4th 363, 383 (2003); *see also Doe v. Marten*, 49

5  Ca. App. 5th 1022, 1028 (2020).

6       Kirkman argues that Crabtree discovered facts regarding the fraud in the 2012

7  email exchange.  However, to the contrary, the 2012 email exchange only confirms

8  what Kirkman previously told Crabtree – i.e. that the Certificate of Authorship does

9  not change the parties' deal.  (UF #62-68.)  As explained above, the 2012 emails

10 only pertained to whether sales of digital issues constituted "single issue sales" to

11 which Crabtree was entitled royalties or whether they were "trade paperbacks" to

12 which Crabtree was not entitled royalties under the parties' agreement.  (UF #65.)

13 There was no repudiation of the agreement or rejection by Kirkman that Crabtree

14 was entitled royalties in any fashion on the Work – just a disagreement about what

15 category digital issue sales fell in.  (UF #62-68.)  Kirkman specifically affirmed this

16 by stating: "You signed a work for hire contract on Invincible.  *I've honored that*

17 *contract*."  (UF #67.)  As to the MTV motion comic, again, this was not a motion

18 picture adaptation of the Work – it was merely a static image of the comic artwork

19 with moving background elements and a voiceover instead of a test bubble.  Further,

20 Crabtree was paid royalties on the MTV motion comic, so there were no damages

21 that would have caused an accrued claim to trigger the statute of limitations.  Simply

22 put, the 2012 emails were limited solely to digital issues and there was *no* discussion

23 of television or film royalties on the Work or Crabtree's copyright interests in general

24 in these 2012 emails.  Further, in a telephone call immediately following this email

25 exchange, Kirkman lulled Crabtree into inaction by promising to get additional

26 colorist work for Crabtree – none of which ever materialized.  (UF #69.)

27      Further, Kirkman did not provide Crabtree with a copy of the Certificate of

28 Authorship until August 31, 2020.  (UF #72.)  Thus, Crabtree had no way of knowing

what was in the document to ascertain whether he had been defrauded.  It was not until receiving and reviewing the Certificate of Authorship and Kirkman refusing to pay him royalties on the Amazon Prime series in August 2020 that Crabtree had sufficient facts to determine that he had been defrauded by Kirkman.

Finally, Kirkman's own statements in 2012 that Crabtree had signed a "Work for Hire" Agreement were false in and of themselves.  As explained above, the Certificate of Authorship is *not* a legally valid "work for hire" agreement, as it was not counter-signed by Kirkman as required by 17 U.S.C. § 101(2).  Crabtree could not have known that there was no legally valid "work for hire" agreement and that Kirkman was lying to him again until Kirkman provided Crabtree with a copy of the Certificate of Authorship in August 2020.  Crabtree's fraud claim did not accrue until, at least, August 2020.

**D.      Crabtree's Breach Of Oral Agreement Claim Is Not Barred By The Statute Of Limitations**

Kirkman argues that Crabtree's breach of oral agreement claim is barred by the two year statute of limitations in Code of Civil Procedure § 339(1) because Kirkman purportedly informed Crabtree in 2012 that he would not pay Crabtree royalties on sales of digital comics – likening them to trade paperbacks, rather than single issue sales (on which both parties agreed Crabtree was entitled to royalties).

This argument is unavailing because, as explained above, this discussion pertained only to the limited matter of whether digital sales of single issues counted as "single issue sales," as to which both parties agreed Crabtree was entitled to royalties, or if they counted as "reprints" to which Kirkman contended Crabtree was not entitled to royalties.  (UF #62-68.)  This was a discrete issue and in the course of the discussion Kirkman confirmed the existence of the parties' agreement and expressly claimed that he had abided by it.  (UF #67 ["I've honored that contract."].)  Kirkman did not repudiate the parties' agreement.  To the contrary, he affirmed it, but simply took the position that digital sales of single issues (something which had

1   not been contemplated by the parties at the time of contracting) were not single issue

2   sales to which Crabtree was entitled royalties.  (UF #65-66.)  There was no discussion

3   in this exchange about royalties on television or motion picture adaptations of the

4   Work.  (*Id.*)  Kirkman cannot construe this discussion about the categorization of

5   digital sales of single issues to commence the running of the limitations period for

6   breaches concerning all other types of media or commercial exploitation of the Work.

7   Further, contrary to the argument in Kirkman's Motion, the continuous accrual

8   doctrine applies to Crabtree's breach of oral agreement claim, and recognizes that

9   each breach by Kirkman is separately actionable and subject to a reanimated statute

10   of limitations period running from the date of each successive breach.    Indeed,

11   *Gilkyson v. Disney Enterprises, Inc.*, 244 Cal. App. 4th 1336 (2016) ("Gilkyson")

12   contradicts Kirkman's position regarding the inapplicability of the continuous

13   accrual doctrine to claims involving entitlement to royalties.

14   In *Gilkyson*, the plaintiffs were the children and heirs of songwriter Terry

15   Gilkyson who had written several songs for the 1967 Disney film The Jungle Book.

16   *Gilkyson*, 244 Cal. App. 4th at 1338.  Under the terms of his contract with Disney,

17   Gilkyson was entitled to royalties from the exploitation of his songs.  *Id.*  However,

18   Disney failed to pay Gilkyson royalties for certain uses of his songs in home

19   entertainment releases of The Jungle Book.  *Id.*  The Gilkyson heirs filed a lawsuit

20   against Disney, alleging breach of contract.  Disney claimed that the breach of

21   contract action accrued when the DVDs were released in 2007 and the lawsuit was

22   not filed until 2013.  *Id.* at 1341-1342.  Accordingly, Disney asserted that the

23   Gilkyson heirs' claims were time-barred because they had not been filed within the

24   four-year statute of limitations for breach of written contract.  *Id.*  The court rejected

25   Disney's position and held that the continuous accrual doctrine applied to the

26   Gilkyson heirs' claims.  In particular, the court found that Disney's breach of contract

27   was ongoing, as Disney continued to exploit Gilkyson's songs in home entertainment

28   releases without paying royalties.  *Id.*  As a result, the Gilkyson heirs' claims accrued

over time, rather than all at once.  *Id.*

There is virtually no difference here.  In the early 2000s Crabtree and Kirkman entered into the agreement providing Crabtree rights to royalties from *Invincible*. (UF #48.)  That verbal agreement carried with it an ongoing obligation for Kirkman to pay Crabtree royalties – it was not a one-time payment.  *Id.*  Every time Kirkman fails to pay Crabtree royalties pursuant to the agreement, there is a breach and that breach is actionable.  *See Howard Jarvis Taxpayers Assn. v. City of La Habra*, 25 Cal.4th 809 (2001).  Indeed, Kirkman's breach with respect to royalties on the Amazon Prime *Invincible* television series did not even occur until August 2020, when Kirkman refused to pay any royalties on the show to Crabtree.  (UF # 70-71.)

Further, because Kirkman did not provide Crabtree with any accounting of what revenues had been received in connection with commercial exploitation of the Work, Crabtree was without sufficient information to know what had been sold or to calculate what royalties he should have received.  (UF #61.)  Thus, because Crabtree had no ability to ascertain whether a breach had occurred (apart from the digital issue sales), the statute of limitations did not commence running.

E.   **Crabtree's Declaratory Relief Claim Did Not Accrue Until 2020 And Is Not Time Barred**

The statute of limitations on a cause of action for declaratory relief concerning the parties' rights and obligations founded on an instrument in writing is four years. *Ginsberg v. Gamson*, 205 Cal. App. 4th 873, 883 (2012).  The statute of limitations does not begin to run until a breach occurs (*ibid.*), and no breach can occur until the time specified for performance has arrived.  *Romano v. Rockwell Internat., Inc.*, 14 Cal. 4th 479, 488 (1996). "A party may seek declaratory relief before there has been an actual breach of an obligation; in such cases the limitations period still does not begin to run until the breach occurs."  *Ginsberg*, 205 Cal.App.4th at 883. Additionally, the "discovery rule" delays accrual of a statute of limitations "until the plaintiff has, or should have, inquiry notice of the cause of action."  *Fox v. Ethicon*

1   *Endo-Surgery, Inc.*, 35 Cal. 4th 797, 808 (2005).

2          First, Crabtree was never provided with a copy of the Certificate of Authorship

3   until Kirkman provided him with a copy of it on August 31, 2020. (UF #72.)  Clearly,

4   without ever having seen the Certificate of Authorship or being aware of its contents,

5   Crabtree lacked actual or even inquiry knowledge of any potential declaratory relief

6   claim as to the document.  Accordingly, the statute of limitations on a declaratory

7   relief claim as to the validity of the Certificate of Authorship did not accrue until

8   Crabtree received a copy of the document on August 31, 2020 and this action was

9   filed in January 2022 – well within the limitations period.

10          Second, Crabtree was not aware of any breach of the oral agreement and, by

11   implication, the Certificate of Authorship by Kirkman until Crabtree learned of the

12   Amazon Prime *Invincible* series in August 2020 and that he was not receiving

13   royalties per the parties' agreement.  (UF #70-71.)  Crabtree filed this action less

14   than two years later.  Of note, Kirkman does not point to any earlier motion picture

15   adaptation of the Work that would have triggered an earlier accrual of the statute of

16   limitations.

17          Finally, the Certificate of Authorship that Kirkman seeks to enforce is not a

18   contract with performance or other obligations on behalf of Kirkman which Crabtree

19   would be entitled to enforce.  As a result, there is no consideration and there is no

20   way for Kirkman to have breached the Certificate of Authorship such that a

21   declaratory relief cause of action could even begin to accrue.  In this action, however,

22   Kirkman is seeking to enforce the Certificate of Authorship as a defense to

23   Crabtree's claims.  Crabtree thus requires a judicial declaration as to the validity of

24   the Certificate of Authorship.  A declaratory relief cause of action is the appropriate

25   vehicle for making such a determination and it is apparent that the statute of

26   limitations does not preclude such a claim.

27

28

**F.**     **Partial Summary Judgment As Entitlement To Royalties On "Trade Paperbacks" Is Not Appropriate As Crabtree Has Never Made A Claim To Such Royalties**

A defendant may not move for summary judgment or partial summary judgment as to a claim that has not been pled.  *Elliott v. Versa CIC, L.P.*, 349 F. Supp. 3d 1000, at *1003 (S.D. Cal. Nov. 16, 2018) (denying defendant's dispositive motion to bar disparate treatment claim not pled in the complaint, stating: "It is unclear to the Court how a claim purportedly not pleaded in this lawsuit was nevertheless a claim on which Defendants moved for summary judgment.")  Here, Crabtree has never claimed entitlement to royalties on so-called "trade paperbacks" and has not pled a claim seeking such.

"Trade paperbacks" in the comic industry are bound volumes of multiple, previously-published single issues of a comic book.  Crabtree's Complaint specifically states that the contract he had with Kirkman was that "Crabtree was to receive twenty percent (20%) of single issue sales of the Work with a minimum of $40 per page and ten percent (10%) of any revenues generated from other film or television commercial exploitation of the Work together with any derivate projects based on the Work and any allied or ancillary rights in the Work." (Complaint ¶ 49.)  Crabtree confirmed this at his deposition and has not made any claim that he is entitled to royalties generated from the multi-issue trade paperbacks of the Work. (UF #42.)  Accordingly, so long as the parties are in agreement as to the definition of "trade paperbacks" as applied to the Work, there is no claim pending by Crabtree as to entitlement to royalties for sales of trade paperbacks.  Thus, partial summary judgment as to this issue is not appropriate and Kirkman does not even specify as to which claim he is seeking partial judgment here.

**V.**     **CONCLUSION**

For the foregoing reasons, Crabtree respectfully requests that Kirkman's Motion be denied in its entirety.  Numerous genuine disputes of material fact exist

and this case must be tried to a jury.

## KIRKMAN'S REPLY BRIEF

## 1.    INTRODUCTION

Crabtree's Opposition is plagued by errors of law and inaccurate statements of fact.  These errors are typified by Crabtree's "cherry-picking" of the many facts that – when taken together – indisputably prove that Kirkman plainly and expressly repudiated Crabtree's joint authorship of *Invincible* by 2012 at the latest (and that Crabtree was on inquiry notice of his state claims by that time).  Crabtree focuses on his "subjective interpretation" of Kirkman's 2012 e-mails where Kirkman tells Crabtree he would receive "no royalties" "beyond [his] page rate"; as a matter of law, Crabtree's subjective view of these e-mails is irrelevant.

Crabtree's other arguments suffer from the same defects, misstating law and ignoring the facts.  All of his claims are barred by the statute of limitations.

## 2.    ARGUMENT

### A.    Crabtree's Copyright Ownership Claim Is Time-Barred Because Crabtree's Ownership Was Repudiated In 2012 At The Latest

#### 1.    Crabtree Admits The Parties Were In A Close Relationship

Crabtree contends that the repudiation standard applies only to parties in a "close relationship" and that he and Kirkman were not in one.  Opp. IV.B.1.  But cases are clear that parties who have a contractual relationship are in a "close" relationship.  Zahedi v. Miramax, LLC, 2022 WL 4596551, at *7 (C.D. Cal. Aug. 19, 2022) (close relationship where parties had "prior business relationship and at least a verbal agreement"). Crabtree admits he and Kirkman had an agreement for

Crabtree to provide coloring services on *Invincible* and he signed the Certificate of Authorship.  Pl.'s Undis. Facts ("PUF") 46, 53.  There was a "close relationship."

## 2.    Crabtree's Subjective Interpretation Is Irrelevant

Crabtree hinges much of his Opposition on his *own* interpretation that, in his view, the 2012 emails are not a repudiation.  Crabtree's subjective interpretation is irrelevant (and evidentiary objections to his testimony are submitted herewith.)

In <u>Straughter v. Concord Music</u>, plaintiffs received copies of albums with notations identifying defendants as the copyright owners but argued they did not see or understand the meaning of the copyright symbols.  The court rejected plaintiffs' subjective argument, holding that sending the albums to plaintiffs repudiated their ownership because whether plaintiffs "actually noticed [the copyright symbol] or understood it is, in the Court's view, irrelevant." 2020 WL 6821313, at *5 (C.D. Cal. 2020).  Similarly, in <u>Weber v. Geffen Records, Inc.</u>, 63 F.Supp.2d 458, 465 (SDNY 1999), the plaintiff knew defendants had omitted plaintiff's name in a copyright registration for one of plaintiff's songs.  The statute of limitations started to run as to that claim, as well as claims for other songs, because a "reasonably diligent person in plaintiff's position would have looked at the . . . copyright registration" to see whether defendants omitted plaintiff as a copyright owner on other songs.  <u>Id.</u>

Here, Crabtree knew he was not listed as co-creator or copyright owner starting with the first issue in 2003, signed the Certificate giving away any rights in 2005, knew about *Invincible* products for which he was not being paid, and was told in several ways in the 2012 emails that Kirkman did not owe him anything.  UF 8-16, 21-27, 32-42.  The question is whether these facts constitute repudiation,

not whether Crabtree subjectively understood the facts to mean that there was a repudiation.  The statute began to run in 2012 at the latest.

### 3.    Crabtree Ignores Critical Admissions In The 2012 Emails

Crabtree accuses Kirkman of "completely misrepresent[ing]" the 2012 emails, but it is Crabtree who misleads.  Crabtree argues the 2012 emails relate only to "royalties owed on a single category of exploitation of the Work – digital reprints of single issues…."  Opp. IV.B.1.c.  But the 2012 emails were not so limited.  Kirkman said: "I don't owe you anything," "You don't get any royalties on single issues past your page rate," "You didn't get 'your share' of the MTV deal, I gave you a bonus," "I paid you for your work," "You did the work with the understanding that you weren't getting royalties beyond your page rate."  UF 21-25.  Tellingly, Crabtree's own statement of facts does not quote the critical language in the 2012 emails, but offers only his slanted paraphrasing.  PUF 65-68.

Crabtree also does not even discuss the 2020 emails wherein Crabtree confirms that his understanding *in 2012* was that Kirkman had "tricked" him into signing the Certificate.  UF 34.  The 2012 and 2020 emails constitute repudiation.

### 4.    The Printed Issues Further Prove Repudiation

Crabtree's argument that the printed issues of *Invincible* did not repudiate his ownership claim fares no better.  Kirkman presented evidence that Crabtree was repeatedly not listed as a "co-creator" but Kirkman and Walker were, and that Crabtree was not listed as a copyright owner, but Kirkman and Walker were.  Crabtree's response, that Crabtree was listed in the same font size and position on the cover as Kirkman and Walker, goes nowhere.  Font size and position mean nothing when the substance expressly says Crabtree was not a co-creator or

copyright owner.  Pisciotti v. Brittingham, 2022 WL 2392198, *12 (W.D. Wash. July 1, 2022) (repudiation where plaintiff given copy of jacket of DVD and "the inside cover attributed the copyright solely to [defendant]").

Crabtree's cases, Robertson, Donen, and Scorpio do not help him as they are motion to dismiss cases.  In fact, Scorpio, helps Kirkman because it held repudiation could exist with "actual notice of the content of the [copyright] registrations and the record labels."  Scorpio Music (Black Scorpio) S.A. v. Willis, 2013 WL 790940, at *6 (S.D. Cal. Mar. 4, 2013).  Kirkman proved just that with Crabtree's own testimony that issues of Invincible were sent to him before they were published and he received about 20 copies after publication.  UF 11; Ex. 6, p. 111:8-112:6.  Because those issues listed Kirkman and Walker as co-creators and copyright owners, but not Crabtree, they are another nail in the coffin.

### 5.      The Certificate of Authorship Repudiated Crabtree's Claim

Crabtree's two arguments as to why the Certificate of Authorship does not constitute repudiation both fail.  Opp. IV.B.1.b.

First, it does not matter whether the Certificate of Authorship is a valid work for hire agreement under copyright law.  All that matters is that the Certificate of Authorship Crabtree signed notified Crabtree that he did not own Invincible and he assigned any rights he may have had to Kirkman.  UF 12-15.

Second, Crabtree's claim that Kirkman allegedly told Crabtree in 2005 when the Certificate was signed that "our deal stays the same" is irrelevant because Crabtree omits the critical subsequent events.  Crabtree completely ignores the 2012 and 2020 emails wherein he admits that in 2012 he felt "tricked" into signing

the Certificate and that Kirkman was relying on it to refuse paying him royalties. UF 34.  Anything supposedly said in 2005 was irrelevant after 2012.

### 6.   Sale Of *Invincible* Products Repudiated Crabtree's Claim

Crabtree's final argument on repudiation based on the sale of *Invincible* products without paying him royalties is also a loser.  Opp.  IV.B.1.d.  The sale of products without paying Crabtree is a repudiation. Seven Arts Filmed Ent. v. Content Media Corp., 733 F.3d 1251, 1257 (9th Cir. 2013).  Crabtree knew that digital comics, collected editions of *Invincible*, and toys were being sold and he was not being paid royalties.  UF 38-42.[9]

### 7.   Equitable Tolling And Estoppel Do Not Apply

The motion explained that equitable tolling and estoppel must be alleged in the complaint but Crabtree's Complaint failed to do so. The Opposition offers no response.  Therefore, these defenses fail for this reason alone.

Crabtree also failed to prove he was diligent.  Crabtree knew or should have known Kirkman disputed his claim in multiple respects starting from when the first issue was published in 2003 and continuing through the 2012 emails.  But Crabtree did nothing to investigate (and there is no reason why he should not have asked for a copy of the Certificate in 2012).  Price v. Fox Entm't Group, 473 F.Supp.2d 446, 458-59 (SDNY Jan. 26, 2007) (no tolling or estoppel where plaintiff claimed he "trusted" defendant but "never reviewed or asked to review the registration documents" or asked who was "identified as the author in those documents").

Crabtree's evidence that Kirkman "lulled" him into not filing a lawsuit until

---

[9] Crabtree cannot argue there is no evidence of *Invincible* merchandise sales.  His expert listed such revenues in her report.  Reply to UF 38; Ex. 24, p.6.

2020 is threadbare.  Crabtree argues that Kirkman deceived him by promising to get him work as a colorist – so what?  Even if true, that says nothing about whether Crabtree knew Kirkman disputed his claim and Crabtree should have investigated. Crabtree's claim that he "was paid royalties on the MTV motion comic" so there was no claim until 2020 is a lie. Kirkman and Crabtree each put in writing that Kirkman told Crabtree he was not paid royalties on the motion comic.  UF 22, 34.

## B.   Crabtree's State Law Claims Are Time-Barred

**Fraud**:  As discussed above, Crabtree knew, or should have known, the facts underlying his fraud claim in at least 2012.  Crabtree's 2020 email confirmed that he believed in 2012 that Kirkman had tricked him into signing the Certificate. UF 21-37. Crabtree should have asked for a copy of the Certificate in 2012.

The discovery rule starting the statute of limitations is an objective standard. "Subjective suspicion is not required. If a person becomes aware of facts which would make a reasonably prudent person suspicious, he or she has a duty to investigate further and is charged with knowledge of matters which would have been revealed by such an investigation." Wilshire Westwood Assocs. v. Atl. Richfield Co., 20 Cal.App.4th 732, 740 (1993); Kline v. Turner, 87 Cal.App.4th 1369, 1374 (2001) (same). Crabtree's alleged subjective interpretation is irrelevant.

**Breach of Contract**:  Crabtree's contract claim is barred for the reasons discussed above. Kirkman repudiated the contract in 2012. Crabtree's subjective interpretation of the 2012 emails is irrelevant and belied by its plain language.

The continuous accrual doctrine does not salvage Crabtree's claim and Gilkyson v. Disney, 244 Cal.App.4th 1336 (2016) is inapposite.  That case, on demurrer, involved a written contract where there were repeated and regularly

recurring missed royalty payments.  Here, there was an oral contract that has never been performed according to Crabtree's interpretation and, on summary judgment, Crabtree could point to only two sporadic alleged royalty payments dating back to 2005 and 2007.  Complaint ¶ 28; UF 16-20.  This is not a continuous accrual case.

**Declaratory Relief:**  For the reasons discussed above, the declaratory relief claims about the Certificate's validity and terms of the parties' contract are barred.

### C.     The Court Should Enter Judgment On Trade Paperback Profits

Crabtree's Complaint encompassed a claim for trade paperback profits, seeking 10% of all "revenues generated from . . . any derivative projects based on the Work and any allied or ancillary rights in the Work."  Complaint ¶ 49. Plaintiff's expert report listed trade paper profits as a part of damages, but then confusingly stated that Crabtree was "not due" trade paper profits.  Henderson Reply Decl. Ex. 24, Sched. 1.1, note 3.  All parties agree that Crabtree is not owed trade paper profits, the Court can and should enter judgment accordingly.

### 3.     CONCLUSION

The motion should be granted.

1

2   Dated:  April 20, 2023             GRODSKY, OLECKI & PURITSKY LLP

3

4                                      By: /s/ Tim B. Henderson
                                           Allen B. Grodsky
5                                          Tim B. Henderson
                                           Attorneys for Defendants
6                                          ROBERT KIRKMAN and
                                           ROBERT KIRKMAN, LLC
7

8

9   Dated:  April 20, 2023             EARLY SULLIVAN WRIGHT, GIZER &
                                       McRAE LLP
10

11                                     By: /s/ Peter Scott
12                                         Devin McRae
                                           Peter Scott
13                                         Lisa Boswell
                                           Brett Moore
14                                         Attorneys for Plaintiff WILLIAM
                                           CRABTREE
15

16

17  Per Local Rule 5-4.3.4(a)(2)(i), I, Tim Henderson, attest that the other signatories

18  listed,  and on whose behalf the filing is submitted, concur in the filing's content

19  and have authorized the filing.

20                      /s/     Tim B. Henderson
21                              Tim B. Henderson

22

23

24

25

26

27

28