1

2

3

4

5

6

7

**O**

8

UNITED STATES DISTRICT COURT

9

CENTRAL DISTRICT OF CALIFORNIA

10

11   WILLIAM CRABTREE,

12                          Plaintiff,

13          v.

14

15   ROBERT KIRKMAN, an individual; ROBERT
     KIRKMAN, LLC, a Kentucky limited liability
16   company; and DOES 1–10, inclusive,

17                          Defendants.

18

Case No.:  2:22-cv-00180-MEMF-AFM

**ORDER GRANTING IN PART MOTION
FOR SUMMARY JUDGMENT [ECF NO. 32]**

19

20          Before the Court is the Motion for Summary Judgment filed by Defendants Robert Kirkman

21   and Robert Kirkman, LLC. ECF No. 32. For the reasons stated herein, the Court GRANTS IN PART

22   the Motion for Summary Judgment.

23   **I.     Background**

24          **A.  Factual Background**

25          Plaintiff William Crabtree ("Crabtree") worked as the colorist for the comic book series

26   *Invincible*. Defendant Robert Kirkman ("Kirkman") is the co-creator and writer of *Invincible*, and

27   Robert Kirkman, LLC ("RKLCC," or collectively with Kirkman, "Defendants") is Kirkman's

28   limited liability company. Crabtree and Kirkman dispute whether Crabtree is a co-author of

1   *Invincible*, whether Crabtree owns a portion of the copyright to *Invincible*, whether Crabtree is owed

2   royalties on derivative works based on *Invincible*, and whether a work for hire contract Crabtree

3   signed is valid and fully governs these issues.

### B. Procedural History

5   Crabtree filed suit in this Court on January 9, 2022. ECF No. 1 ("Complaint" or "Compl.").

6   Crabtree brings six causes of action: (1) declaratory relief that he a is a joint author of *Invincible*

7   under 17 U.S.C. §§ 101 and 201(a) (*see id.* ¶¶ 31–33); (2) promissory fraud against Kirkman and

8   RKLLC (*see id.* ¶¶ 34–42); (3) declaratory relief that the Certificate of Authorship "is void ab initio

9   and of no force or effect" or, alternatively, that it applies solely to Crabtree's ownership rights in a

10  motion picture derived from *Invincible* and has no other purpose (*see id.* ¶¶ 43–47); (4) breach of

11  oral contract against Kirkman and RKLLC (*see id.* ¶¶ 48–52); (5) common counts for money had or

12  received by Kirkman and RKLLC (*see id.* ¶¶ 53–55); and (6) a claim for an accounting against

13  Kirkman and RKLLC (*see id.* ¶¶ 56–59). Kirkman and RKLLC each answered on March 14, 2023.

14  ECF Nos. 15, 16.

15  Defendants filed their Motion for Summary Judgment on April 20, 2023. ECF No. 32

16  ("Motion" or "Mot."). Defendants and Crabtree jointly briefed the Motion and filed one

17  Memorandum of Points and Authorities. ECF No. 32-1 ("MPA"). The parties also each filed Joint

18  Statements of Uncontroverted Facts and Genuine Disputes. ECF No. 32-2 ("DSUF"); ECF No. 32-3

19  ("PSUF"). The parties filed an evidentiary appendix and various declarations and other evidence.

20  ECF Nos. 32-4–32-33. Defendants also filed a Request for Judicial Notice[1] and Evidentiary

21  Objections to certain evidence cited by Crabtree. ECF No. 32-34 ("RJN"); ECF No. 32-35.

22  The Court held a hearing on the Motion on November 9, 2023.

23

24  / / /

25

26  [1] Defendants request judicial notice of a Complaint from another lawsuit. *See* RJN. The Court finds the
existence of this document appropriate for judicial notice, as its existence "can be accurately and readily

27  determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). The
Request for Judicial Notice (ECF No. 32-34) is therefore GRANTED. However, the Court does not rely on

28  the noticed document in deciding this Motion.

**II.**     **Applicable Law**

Summary judgment should be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those that may affect the outcome of the case. *Nat'l Ass'n of Optometrists & Opticians v. Harris*, 682 F.3d 1144, 1147 (9th Cir. 2012) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

A court must view the facts and draw inferences in the manner most favorable to the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156, 1161 (9th Cir. 1992). "A moving party without the ultimate burden of persuasion at trial—usually, but not always, a defendant—has both the initial burden of production and the ultimate burden of persuasion on a motion for summary judgment." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). To carry its burden of production, the moving party must either: (1) produce evidence negating an essential element of the nonmoving party's claim or defense; or (2) show that there is an absence of evidence to support the nonmoving party's case. *Id.*

Where a moving party fails to carry its initial burden of production, the nonmoving party has no obligation to produce anything, even if the nonmoving party would have the ultimate burden of persuasion at trial. *Id.* at 1102–03. In such cases, the nonmoving party may defeat the motion for summary judgment without producing anything. *Id.* at 1103. However, if a moving party carries its burden of production, the burden shifts to the nonmoving party to produce evidence showing a genuine dispute of material fact for trial. *Anderson*, 477 U.S. at 248–49. Under these circumstances, the nonmoving party must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is no genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (internal quotation marks omitted). If the nonmoving party fails to produce enough evidence to create a genuine issue of material fact, the motion for summary judgment shall be granted. *Id.* at 322 ("Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion,

1  against a party who fails to make a showing sufficient to establish the existence of an element

2  essential to that party's case, and on which that party will bear the burden of proof at trial.").

3        A party cannot create a genuine issue of material fact simply by making assertions in its

4  legal papers. *S.A. Empresa de Viacao Aerea Rio Grandense v. Walter Kidde & Co.*, 690 F.2d 1235,

5  1238 (9th Cir. 1982). Rather, there must be specific, admissible evidence identifying the basis for

6  the dispute. *See id.* "If a party fails to properly support an assertion of fact or fails to properly

7  address another party's assertion of fact . . . the court may . . . consider the fact undisputed." Fed. R.

8  Civ. P. 56(e)(2). The Court need not "comb the record" looking for other evidence; it is only

9  required to consider evidence set forth in the moving and opposing papers and the portions of the

10  record cited therein. *Id.* 56(c)(3); *Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir.

11  2001). The Supreme Court has held that "[t]he mere existence of a scintilla of evidence . . . will be

12  insufficient; there must be evidence on which the jury could reasonably find for [the opposing

13  party]." *Anderson*, 477 U.S. at 252.   To carry its ultimate burden of persuasion on the motion, the

14  moving party must demonstrate that there is no genuine issue of material fact for trial. *Nissan Fire*,

15  210 F.3d at 1102; *Celotex Corp.*, 477 U.S. at 323.

16  **III.   Findings of Fact[2]**

17        The Court finds the following material facts are established for trial[3] under Federal Rules of

18  Civil Procedure 56(a) and 56(g):

19

20  [2] The facts set forth below are taken from the parties' Statements of Uncontroverted Facts and the various
21  exhibits cited therein. *See* DSUF; PSUF. To the extent that any statements of fact are omitted, the Court
concludes they are not material to the disposition of this Motion. To the extent that any of the facts set below
22  were allegedly disputed by the opposing party, the Court concludes that no actual dispute exists or that the
adopted language resolves the dispute.

23  In making these Findings of Fact, the Court considered Defendants' Evidentiary Objections. ECF No. 32-35.
24  The Court did not find any evidence that Defendants objected to essential to finding any fact stated herein,
except where explicitly stated otherwise. The Court need not reach any objection except those addressed in
25  this Order.

26  [3] Defendants reserved the right to dispute at a later stage certain facts that were conceded for this Motion. See,
e.g., PSUF ¶ 48 ("Undisputed for purposes of this Motion only"). In the hearing, counsel for Defendants
27  explained that certain facts are not relevant to this Motion, which focuses on the statute of limitations but are
still plainly in dispute in the action, and that Defendants conceded them for this Motion only to focus disputes
on issues relevant to the Motion. This is permissible under Rule 56. *See* Fed. R. Civ. Pro. 56, Notes of

28

*Invincible* is a comic book and graphic novel series, first published in 2003. *See* DSUF ¶ 3. Kirkman is a co-creator and writer of *Invincible*. *See id.* ¶ 4; *see also* ECF No. 32-8 at 2–23 (examples of *Invincible* covers listing Kirkman as co-creator and writer). Crabtree was the colorist[4] on the first 50 issues of *Invincible*; although two other colorists worked on *Invincible* before Crabtree did, Crabtree was credited as the colorist on the first 50 issues. DSUF ¶ 7; PSUF ¶ 46. Kirkman provided the plot and dialogue, third party Cory Walker ("Walker") provided drawings, and Crabtree provided the color. PSUF ¶ 45; *see also* DSUF ¶ 6.

Crabtree received copies of every Invincible issue he worked on prior to publication. DSUF ¶ 11; *see also* ECF No. 32-13 at 6 (Crabtree Tr. 111:08–12). Certain *Invincible* covers listed Kirkman and Walker as "Co-Creators," and listed Crabtree only as "Colorist" and not a co-creator. DSUF ¶ 8; *see also* ECF No. 32-8 at 2–23 (examples). These covers generally still listed Crabtree's name prominently along with Kirkman's and Walker's. *See, e.g.*, ECF No. 32-8 at 2. Other covers listed Kirkman, Walker, and Crabtree all together, without listing roles for any of them or distinguishing their involvement. DSUF ¶ 8; *see also* ECF No. 32-30 at 2–20 (examples). No cover ever explicitly identified Crabtree as a "co-creator." DSUF ¶ 9. Certain covers also stated that Kirkman and Walker owned the copyright, and no cover ever stated that Crabtree owned the copyright. *Id.* ¶ 10; *see also* ECF No. 32-8 at 2–23 (examples).

---

Advisory Committee on 2010 amendments. All facts Defendants reserve the right to dispute are explicitly identified as such herein.

[4] The Court makes no finding as to whether Crabtree was a "co-creator" of *Invincible*. The Court finds that there is no dispute of fact that Kirkman was a co-creator, but that there is a dispute of fact as to whether Crabtree also was a co-creator. *See* DSUF ¶ 3; PSUF ¶ 44.

Crabtree and Kirkman had an agreement regarding Crabtree's compensation.[5] Under that agreement, with respect to single issue sales,[6] Crabtree was to receive 20% of single issue sales of *Invincible*, at a minimum of $40 per page.[7]

In February 2005, Kirkman entered a deal with Paramount for the possible creation of a motion picture based on *Invincible*. DSUF ¶ 17. Kirkman paid a portion of the Paramount money to Crabtree. *Id.* ¶ 18.

On approximately June 14, 2005, Kirkman approached Crabtree at a comic convention and asked Crabtree to sign a Certificate of Authorship[8] regarding *Invincible*. PSUF ¶ 50. In a conversation that lasted approximately a minute, Kirkman convinced Crabtree to sign the Certificate of Authorship. *See* ECF No. 32-22 at 23 (Crabtree Tr. 133:08–20). Kirkman explained to Crabtree that the Certificate of Authorship was necessary to facilitate negotiations with movie studios, and that Kirkman's and Crabtree's deal would stay the same notwithstanding the Certificate of

---

[5] Kirkman asserts that he reserves the right to prove there was no agreement, *see* MPA at 26 n.4, but the Court finds that there is no genuine issue of material fact as to whether there was an agreement, only as to its terms. Kirkman stated in an interrogatory response that he understood the original agreement with Crabtree was that Crabtree would receive "$40 per page or 20% of single issue sales of Invincible, whichever was higher." *See* ECF No. 32-27 at 9. Kirkman does not dispute the fact that this was Kirkman's understanding of the agreement. *See* PSUF ¶ 49. And Kirkman wrote in an email to Crabtree in 2012 "You did the work with the understanding that you weren't getting royalties beyond your page rate," suggesting that Kirkman understood there was an agreement with Crabtree at the outset as to, at minimum, Crabtree's page rate. *See* DSUF ¶ 24. All of this shows that there is no genuine dispute as to whether Crabtree and Kirkman had some initial agreement. There are disputed issues of fact as to what the agreement was (particularly as to royalties from derivative uses, as discussed in further detail below), but not as to whether some agreement existed.

[6] Single issue sales are sales of one issue of the comic book, which are distinct from "trade paperbacks" or "TPBs," which are bound, reprinted collections of many single issues in one volume. Crabtree concedes that he was never entitled to royalties on trade paperbacks. *See* MPA at 33.

[7] The parties dispute whether Crabtree was to receive any compensation beyond this—that is, for revenues derived from film, television, or other derivative projects based on *Invincible*.

The Court also notes that Kirkman phrased the single issue sales term slightly differently as "$40 per page or 20% of single issue sales of Invincible, whichever was higher." *See* ECF No. 32-27 at 9. The Court understands this to be the same as 20% of single issue sales at a minimum of $40 per page.

[8] The Certificate of Authorship describes *Invincible* as a "work made for hire," and the parties at times refer to it as the "work for hire contract." *See* ECF No. 32-15. When the court quotes or otherwise refers to descriptions of a work for hire contract, the Court is referring to this Certificate of Authorship.

Authorship.[9] *See* PSUF ¶ 50–52. Crabtree signed the Certificate of Authorship. DSUF ¶ 12. Kirkman did not sign the document, nor did any other representative of RKLLC. PSUF ¶ 57. Crabtree was not paid any consideration specifically in exchange for signing. PSUF ¶ 58. After Crabtree signed, Kirkman took the document, and Crabtree was not provided a copy of it until August 2020. PSUF ¶ 55. Crabtree had already begun working on *Invincible* when he signed the document in 2005 (with the first issue published in 2003), and he continued working on *Invincible* afterwards. DSUF ¶ 16.

The Certificate of Authorship stated that Kirkman was the "sole author" of *Invincible* and "owner of all rights of every kind and nature." DSUF ¶ 13. It also stated that Crabtree "irrevocably and absolutely assign[s] to [Robert Kirkman, LLC] all of [Crabtree's] rights (copyrights, rights under copyright and otherwise, whether known now or in the future)" in perpetuity. DSUF ¶ 14.

In 2006, Kirkman sent emails with Crabtree copied that discussed the possibility of creating toys based in *Invincible*. DSUF ¶ 38; *see also* ECF No. 32-10 at 2–4. Crabtree does not specifically recall receiving royalties for toys. DSUF ¶ 41.

In November 2007, Kirkman entered an agreement with MTV for a possible motion picture based on *Invincible*. DSUF ¶ 19. Kirkman made a payment to Crabtree related to the MTV agreement. DSUF ¶ 20.

Throughout the time Crabtree worked on Invincible, Kirkman did not provide Crabtree with accounting statements or other disclosures regarding revenues,[10] and so Crabtree relied on Kirkman's representations as to the amounts of money Crabtree was owed. PSUF ¶ 61. Crabtree stopped working on *Invincible* in 2008. DSUF ¶ 16.

In 2012, Crabtree became aware that digital versions of single issues of *Invincible* were being sold online. PSUF ¶ 62. Digital versions of single issues were not contemplated when Kirkman and

---

[9] Defendants reserve the right to dispute at a later stage what Kirkman said to Crabtree at the time Crabtree signed the agreement, as Defendants' counsel explained at the hearing.  *See* PSUF ¶ 50–52. Defendants do not dispute that Kirkman asked Crabtree to sign the Certificate of Authorship at a comic convention  on approximately June 14, 2005, or that Crabtree signed the Certificate of Authorship at that time.

[10] Defendants reserve the right to dispute at a later stage whether Kirkman provided accounting statements or other financial disclosures to Crabtree, as Defendants' counsel explained at the hearing. *See* PSUF ¶ 61. Defendants do not dispute that Crabtree relied on Kirkman to understand what money Crabtree was owed.

Crabtree originally agreed that Crabtree would receive money for single issue sales. *Id.* ¶ 63. Crabtree viewed these as more akin to single print issues than reprinted print TBPs, and so Crabtree believed he should be entitled to payment for them. *Id.* ¶ 64.

Separately, in February 2012, Kirkman was sued by Tony Moore, who had worked as an artist with Kirkman on a different project, *The Walking Dead*. DSUF ¶ 28.

Crabtree emailed Kirkman in March 2012 and asked, "shouldn't i be getting revenue for the [issues I worked on] being sold there?" DSUF ¶ 21 (capitalization in original). Crabtree added: "this seems similar to the mtv motion comic, which i received my share of." *Id.* Kirkman responded that "The digital issue reprints are no different than the TPBs . . . You didn't get 'your share' of the MTV motion comics. I gave you a bonus because it was an adaptation directly using your work. You signed a work for hire contract on Invincible. I've honored that contract." *Id.* ¶ 22. Crabtree responded, "that's bullshit." *Id.* ¶ 23. Kirkman responded, "I'm sorry you feel that way, Bill. But I don't owe you anything." *Id.* ¶ 24. Kirkman added: "I paid you for your work . . . You did the work with the understanding that you weren't getting royalties beyond your page rate. I find it odd that you'd complain about that now. You did work that you were paid for. What's suddenly different?" *Id.* Crabtree responded twice in quick succession. *See id.* ¶¶ 25, 29. First, he asked "this is the same work for hire contract tony [Moore] is suing you over at the momen[t], correct?" *Id.* ¶ 29. Five minutes later, Crabtree responded against, and requested that they speak in person. *Id.* ¶ 25. On a phone call that followed, Kirkman explained his view that digital issue sales were not single issue sales that would entitle Crabtree to a royalty. PSUF ¶ 69. Kirkman also mentioned that Crabtree had signed a "work for hire contract." DSUF ¶ 27. Kirkman stated that he "felt bad" and would try to help find Crabtree other work. *Id.*

In August 2020, Crabtree learned that Amazon Prime intended to develop an episodic series based on *Invincible*. PSUF ¶ 70. Crabtree texted Kirkman and accused Kirkman of "tricking" Crabtree into signing a contract, and also emailed Kirkman. *See* DSUF ¶ 33. Kirkman responded via email. *See id.* Crabtree responded via email on August 26, 2020, and said:

> When you gave me that to sign you said, 'our deal's the same, it's just that Hollywood people don't want to deal with multiple creators so this just says you don't own *invincible*'. I took your word for it and thought nothing more if it. Then, we talked 8 years ago or

whenever that was and I referenced the money you gave me for the mtv motion comic. I said 'you gave me my share for that' and you said, 'that wasn't your share, that was a bonus, you signed that work for hire agreement, remember?'. So that's what I mean by you tricking me into signing it. . . . My deal on invincible was 20% of single issue sales and 10% of any ip money. You frequently told me I could trust you and that you'd sign something to the effect of the above mentioned deal. I was foolish not to take you up on that. In my opinion some sort of profit sharing of money from the ip would be the fair and honorable thing to do, considering our initial verbal agreement. When I realized that I had unknowingly signed a work for hire agreement, I assumed that you would try to avoid sharing any profit with me. Perhaps I was mistaken in that assumption, I don't know."

DSUF ¶ 34.

On August 31, 2020, Kirkman responded and explained that "you need to understand this was 16 years ago whenever these conversations would have taken place. I have never given a colorist a stake in media rights on ANY project I've ever done in my entire career." *Id.* ¶ 35. Kirkman also attached the Certificate of Authorship Crabtree signed to that email. *Id.* Crabtree responded and said: "One of us is certainly misremembering things. Do you remember giving me a portion of the option money for invincible the last time it was optioned?" *Id.* ¶ 36. Kirkman responded "I remember giving you a bonus while you were still coloring the book, as I explained on the phone 8 years ago when we spoke. I wish you well." *Id.* ¶ 37.

## IV.   Discussion

For the reasons stated below, the Court GRANTS IN PART the Motion.[11]

### A.   The Copyright Statute of Limitations bars Crabtree's copyright claims (first cause of action and portions of sixth cause of action).

Defendants first argue that the statute of limitations for copyright actions bars Crabtree's first and sixth causes of action. *See* MPA at 18–24. The Court finds that the copyright statute of limitations does indeed bar Crabtree's first cause of action and bars Crabtree's sixth cause of action to the extent it is based on copyright ownership.[12]

---

[11] The Court notes at the outset that Crabtree argues the Motion was untimely, as it was set for a hearing after the last date to hear motions. *See* MPA at 39. Defendants emailed the Court for an earlier hearing date, but none were available, and the Court amended the scheduling order in this action shortly after the Motion was filed in order to account for the Court's lack of availability for hearings. The Court will not deny the motion on the purported basis that it was untimely.

[12] The Court finds that the sixth cause of action for an accounting is not entirely barred, because although it is based in copyright to some extent, it is also based on purported breaches of contract. *See* Compl. ¶ 57

There is a three year statute of limitations for copyright actions. 17 U.S.C. § 507(b). This statute of limitations applies to Crabtree's first cause of action, seeking declaratory relief that he is a co-author, and to portions of his sixth cause of action, seeking an accounting. *See Aalmuhammed v. Lee*, 202 F.3d 1227, 1230 (9th Cir. 2000) (applying copyright statute of limitation to claims seeking a declaratory judgment that plaintiff was an author and an accounting for profits). The key question here is when the time for that statute of limitations began to run.

Claims of co-ownership accrue "when plain and express repudiation of co-ownership is communicated to the claimant."[13] *Zuill v. Shanahan*, 80 F.3d 1366, 1369 (9th Cir. 1996). There is no set formula for what constitutes repudiation. Repudiation can occur by listing one purported author in movie credits "far below the more prominent names" and with a different role. *See Aalmuhammed*, 202 F.3d at 1231. Communicating to a purported author directly that he or she is not an author could also constitute repudiation, but equivocal statements that "leav[e] the question of authorship open for further discussion" are not sufficient. *See id.* Repudiation can also occur by claiming sole ownership in writing, including by furnishing copies with a printed copyright notice, or with written contracts that claim sole ownership of the copyright. *See Zuill*, 80 F.3d at 1368–69

_____

(Crabtree claims he is entitled to an accounting not just based on being a co-author, but "in the alternative, by virtue of the parties' course of dealing and Crabtree's entitlement to receive contingent compensation based on the exploitation of the Work (and all derivative and ancillary rights therein)"). Defendants conceded in the hearing that the copyright statute of limitations would not apply to this claim to the extent it is based on breach of contract. The Court sees no other basis to find for Defendants on the sixth cause of action, and therefore Crabtree's sixth cause of action survives to the extent it is based on breach of contract. But the Court grants summary judgment to Defendants on the sixth cause of action to the extent it is based on copyright ownership.

[13] Crabtree argues that this rule only applies when the parties are in a "close relationship." *See* MPA at 40 n.6 (citing *Seven Arts Filmed Ent. Ltd. v. Content Media Corp. PLC*, 733 F.3d 1251, 1256 (9th Cir. 2013) ("Extending *Zuill*'s accrual rule to encompass claims against those who are not in a close relationship could introduce uncertainty into the enforcement of copyrights and require copyright holders to file suit against any third party that might be deemed to have repudiated the copyright owner's title"). The Court finds that the undisputed facts show without doubt that Crabtree and Kirkman were in a close relationship such that the exception to *Zuill* suggested by *Seven Arts* does not apply. Kirkman is not a stranger to Crabtree, or an obscure "third party that might be deemed to have repudiated the copyright." *See Seven Arts*, 733 F.3d at 1256. Kirkman is indisputably one of the principal authors of the work, as Crabtree knew. The two had various contracts and worked together on *Invincible*. If (or when) Kirkman repudiated Crabtree's ownership, Crabtree needed to take prompt action, in a way totally different from if a third party had done so. Thus, the general *Zuill* rule applies.

1  (claiming sole ownership "by furnishing copies of the Symphonics product in August 1986 with a

2  printed copyright notice" constituted "plain and express repudiation").

3         Here, Defendants point to several instances which they argue constituted repudiation. The

4  Court need not reach all these instances, as the Court finds that at minimum, the conversations in

5  2012 were a clear repudiation of Crabtree's ownership interest sufficient for statute of limitations to

6  accrue. Accordingly, the Court will grant summary judgment on the copyright-related claims based

7  on the finding that the statute of limitations began to run in 2012 and has long expired.

8              i.   The emails and phone calls from 2012 constituted an express repudiation of
                    Crabtree's ownership of any copyright interest in *Invincible*.
9

10        The parties have a significant disagreement as to what exactly occurred in 2012. Defendants

11 argue that the emails and phone call between Crabtree and Kirkman in 2012 constituted a

12 repudiation of Crabtree's ownership in *Invincible*, which would trigger the statute of limitations. *See*

13 MPA at 20–22. Crabtree argues otherwise. *See id.* at 44–45. The Court finds that despite Crabtree's

14 arguments, the only reasonably interpretation of the communications in 2012 is that Kirkman

15 repudiated Crabtree's ownership of a copyright to *Invincible*. No reasonable juror could find

16 otherwise.

17        As an initial matter, the Court notes that there is a factual dispute as to Kirkman's and

18 Crabtree's initial agreement regarding Crabtree's compensation. Crabtree stated in deposition[14] and

19 an interrogatory response that he understood their agreement to be that Crabtree would receive 20%

20 of single issue sales[15] of *Invincible*, at a minimum of $40 per page, and 10% of revenues derived

21 from film, television, or other derivative projects based on *Invincible*. *See* PSUF ¶ 48. Kirkman

22  _____

23 [14] Defendants object to this portion of Crabtree's deposition testimony on the grounds that it is irrelevant, as
   (per Defendants) Crabtree's subjective understanding of the agreement is irrelevant to the statute of
24 limitations defense. *See* ECF No. 32-35 ¶ 1. The Court finds this testimony relevant to the action, as
   Crabtree's initial understanding is important to understand when, if ever, Kirkman made clear that Kirkman
25 had a different understanding of the deal. This different understanding is relevant to understanding
   repudiation of ownership, whether Crabtree was defrauded, and other issues that are central to the action.
26 Defendants' objection is therefore OVERRULED.

27 [15] Single issue sales are sales of one issue of the comic book, which are distinct from "trade paperbacks" or
   "TPBs," which are bound, reprinted collections of many single issues in one volume. Crabtree concedes that
28 he was never entitled to royalties on trade paperbacks. *See* MPA at 33.

11

stated in an interrogatory response that he understood their agreement to be that Crabtree would receive 20% of single issue sales of *Invincible*, at a minimum of $40 per page,[16] but no royalties on other derivative projects. *See id.* ¶ 49.

Accordingly, it bears emphasis that there are potentially three distinct terms at issue: (1) Crabtree's ownership in Invincible; (2) Crabtree's entitlement to 20% on single issue sales; and (3) Crabtree's entitlement to 10% (or anything else) on derivative projects. The one term the parties appear to agree upon is Crabtree's entitlement to 20% on single issue sales.

In 2012, Kirkman made clear to Crabtree Kirkman's view that digital editions should not be treated as single issue sales. *See* DSUF ¶ 22. Kirkman also explained that past payments resembling royalties on derivative works had actually been, in Kirkman's view, bonuses rather than royalties owed. *See id.* Finally, Kirkman also made repeated references to the "work for hire" contract Crabtree signed. *See id.*

Kirkman argues that the fact that Kirkman made it clear that Crabtree was not entitled to 20% on the digital issues is clear repudiation of ownership, but it is not—the fact that Kirkman (or even both parties) did not consider digital issues to be subject to the 20% on single issue sales says nothing about whether Crabtree had ownership of the copyright.

Similarly, Kirkman argues that the fact that Kirkman made clear that Crabtree was not entitled to anything on derivative projects and that the prior payments had been bonuses is clear repudiation, but it too is not—the fact that Kirkman (or even both parties) did not consider the MTV payment to be a share or even that anything was due on derivative projects says nothing about whether Crabtree had ownership of the copyright.

What is clear repudiation, however, are Kirkman's repeated references to a "work for hire" contract. Under copyright law, the general rule is that the author of the work owns the copyright to the work, or where there are multiple authors, the authors are co-owners of the copyright. *See* 17 U.S.C. § 201(a). But a "work made for hire" is different. The party who commissions a "work made

---

[16] Kirkman phrased the terms slightly differently as "$40 per page or 20% of single issue sales of Invincible, whichever was higher." *See* ECF No. 32-27 at 9. The Court understands this to be the same as 20% of single issue sales at a minimum of $40 per page.

1    for hire" is considered the author of the work and thus owns the copyright unless the parties

2    explicitly agree otherwise. *See* 17 U.S.C. § 201(b).  Here, Kirkman's repeated statements in 2012

3    that Crabtree signed a "work for hire" agreement, viewed against these widely understood

4    background principles and made between relatively sophisticated parties with industry experience,[17]

5    were statements that Crabtree did not own the copyright and that Kirkman (who commissioned the

6    work) was the sole author and owner of the copyright. *See* DSUF ¶ 22 (on March 17, 2012, Kirkman

7    wrote: "You signed a work for hire contract on Invincible ."), ¶ 29 (on March 17, 2012, Crabtree

8    responded: "this is the same *work for hire* contract tony [Moore] is suing you over at the momen[t],

9    correct?" (emphasis added)), ¶ 27 (on a March 27, 2012 phone call, Kirkman explained to Crabtree

10   Kirkman's view that Crabtree signed a *work for hire* agreement). And Crabtree himself

11   acknowledges that in the 2012 phone call, Kirkman made his position known that Crabtree signed

12   "what Kirkman described as a *'work for hire contract'* that governed copyright ownership of and

13   revenues generated concerning Invincible that was not otherwise covered by the parties' agreement."

14   *See* ECF No. 32-19 at 5 (Crabtree's Interrogatory Responses) (emphasis added).  Crabtree also

15   acknowledged in 2020 that Crabtree had referenced the work for hire contract in 2012. *See* DSUF ¶

16   34 (Crabtree wrote in 2020, describing the 2012 conversation, "I said 'you gave me my share for

17   that' and you said, 'that wasn't your share, that was a bonus, you signed that *work for hire*

18   agreement, remember?'" (emphasis added)). There is no doubt that Kirkman brought his belief in the

19   existence of a "work for hire" contract to Crabtree's attention in 2012. At no point in 2012 or later

20   did Crabtree say anything that suggested he did not understand the implications of Kirkman's

21   statements regarding the "work for hire" contract. In making these statements, Kirkman

22   communicated that Crabtree was not a copyright owner of *Invincible*.

23

24   _____

25   [17] The Court's holding here rests on the understanding that Crabtree knew in 2012 that a work for hire
     contract was a contract that would disavow ownership in a copyright. The Court finds that all undisputed facts
26   support this finding, including Crabtree's Interrogatory response (where he states that in 2012, Kirkman stated
     that Crabtree signed "what Kirkman described as a 'work for hire contract' that *governed copyright*
27   *ownership*," *see* ECF No. 32-19 at 5 (emphasis added)), the fact that Crabtree and Kirkman are both
     sophisticated parties with industry experience, and the fact that in no email did Crabtree ask what Kirkman
28   meant in his references to the "work for hire" contract.

1      Given these undisputed facts, the Court finds that there is no genuine issue of material fact

2  that Kirkman clearly repudiated Crabtree's purported ownership interest in 2012, and, therefore, the

3  three-year statute of limitations began to accrue then.

4      In arguing otherwise, Crabtree cites his deposition testimony, which he argues shows that

5  Kirkman ratified their agreement rather than repudiating it. Crabtree points to Kirkman's statement

6  that Kirkman "honored [their] deal;" Crabtree testified in deposition that he thought Kirkman had

7  honored the deal because Crabtree received what appeared to be royalties on certain derivative

8  projects, including the "Paramount option." *See* ECF No. 32-22 at 6–7 (Crabtree Tr. 55:20–56:01).

9  But this interpretation—that Kirkman was affirming that he would honor the deal as Crabtree

10 understood it—is impossible to square with Kirkman's comments on the MTV deal. Kirkman

11 explicitly stated that the MTV money was not a "share" owed to Crabtree and rather simply a bonus.

12 *See* DSUF ¶ 34. Kirkman also brought up the "work for hire" contract (the Certificate of Authorship)

13 multiple times as discussed above. *See id.*; DSUF ¶ 27. Although Crabtree testified that he did not

14 view the 2012 conversations as a repudiation at that time, this testimony is not possible to square

15 with the clear record of these conversations. *See* ECF No. 32-22 at 25 (Crabtree Tr. 153:06–14).

16 Crabtree's explanation as to why he believed this—that Kirkman indicated he would honor their

17 deal—is inconsistent with what occurred and what Kirkman actually said. *See* ECF No. 32-22 at 25

18 (Crabtree Tr. 153:18–20). Kirkman said "You signed a work for hire contract on Invincible. I've

19 honored that contract." DSUF ¶ 22.

20      A communication that unequivocally explains that the plaintiff does not have ownership

21 rights is a repudiation. *See Aalmuhammed*, 202 F.3d at 1231 (holding that a communication that

22 "leav[es] the question of authorship open for further discussion" is not a repudiation, but suggesting

23 that a more unambiguous communication would be one). Here, no reasonable juror could find

24 ambiguity in Kirkman's statements. Kirkman plainly explained that he believed Crabtree signed a

25 "work for hire" contract, which both parties understood would mean that Crabtree was not an author

26 of copyright owner of *Invincible*. This express repudiation caused the statute of limitations to run,

27 and that statute of limitations had long expired when Crabtree filed suit in 2022. The copyright-

28 related claims are therefore time-barred.

ii.     Equitable estoppel does not save Crabtree's copyright claim

Crabtree argues that even if the statute of limitations has run, equitable tolling saves his claims, because "Kirkman Lulled Crabtree Into Inaction." *See* MPA at 46–47. This argument fails.

A plaintiff is entitled to equitable tolling only if the plaintiff shows: "(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way and prevented timely filing."[18] *Holland v. Fla.*, 560 U.S. 631, 649 (2010). Crabtree argues that several actions by Kirkman should warrant equitable tolling. Specifically, Crabtree points to the facts that: Kirkman "induced" Crabtree to sign the certificate of authorship, Kirkman paid bonuses to Crabtree that were equivalent to royalty payments for derivative works, and Kirkman did not provide accounting statements to Crabtree that would allow Crabtree to understand what he was owed. *See* MPA at 46. But none of these relate to the key repudiation described above in 2012. Once Kirkman repudiated Crabtree's rights in 2012, and clearly explained his position that Crabtree was not owed royalties on derivative works, nothing prevented Crabtree from understanding his rights and filing suit. Crabtree points to nothing that occurred *after 2012* that lulled him into inaction. There was therefore no "extraordinary circumstance" sufficient for equitable tolling. *See Holland*, 560 U.S. at 649.

Because the Court finds that Kirkman repudiated Crabtree's ownership in 2012, and equitable tolling does not apply, the statute of limitations has run on Crabtree's copyright-related claims.[19] The Court will therefore grant summary judgment to Defendants on Crabtree's first cause of action in whole and on Crabtree's sixth cause of action to the extent it is based on purported authorship or copyright ownership.

/ / /

/ / /

---

[18] Although the Supreme Court's holding in *Holland* was not specifically related to copyrights, District Courts regularly apply this test in the copyright context. *See, e.g.*, *Fahmy v. Jay-Z*, 835 F. Supp. 2d 783, 788 (C.D. Cal. 2011); *Kiely v. Universal Music Grp.*, No. LACV194826MWFSSX, 2019 WL 9443183, *4 (C.D. Cal. Dec. 12, 2019). The Court similarly holds that it applies here.

[19] The Court need not reach the other bases upon which Kirkman alleges repudiation.

**B. Crabtree's claims for fraud are time barred (second cause of action, and certain theories pleaded as part of the third cause of action).**

There is a three year statute of limitations in California for actions for relief on the ground of fraud or mistake. Cal. Code Civ. P. § 338(d). This time begins accruing upon "the discovery, by the aggrieved party, of the facts constituting the fraud or mistake." *Id.* This statute of limitations applies to Crabtree's second cause of action, for promissory fraud in inducing Crabtree to sign the certificate of authorship, and third cause of action, for declaratory relief to invalidate the Certificate of Authorship.[20]

Crabtree argues at length that the statute did not accrue until 2020, when Crabtree received the contract and purportedly learned he was defrauded. *See* MPA at 47–49. The Court finds otherwise. Crabtree knew long before 2020 that the Certificate of Authorship was different than what he believed it was when he signed it. At the very least, Crabtree learned in 2012 that Kirkman viewed the work for hire contract as a binding limitation on Crabtree's ownership rights in the copyright, as described in a separate section above. This was different from what Crabtree claims Kirkman told him when Crabtree signed the contract. On this basis, no reasonable juror could find that Crabtree did not know he was defrauded until 2020.

The cases Crabtree cites do not persuade the Court otherwise. These cases articulate the general principle that a defendant may not "lull his adversary into a false sense of security, and thereby cause his adversary to subject his claim to the bar of the statute of limitations, and then be permitted to plead the very delay caused by his course of conduct as a defense to the action when brought." *Lantzy v. Centex Homes*, 31 Cal. 4th 363, 383 (2003); *see also Doe v. Marten*, 49 Cal. App. 5th 1022, 1028 (2020) (equitable estoppel applies where "defendant's act or omission actually and reasonably induced the plaintiff to delay commencement of an action"); *Victor Oil Co. v. Drum*,

---

[20] Crabtree's third cause of action seeks two alternative forms of declaratory relief: (A) that the Certificate of Authorship is void ab initio and of no force or effect" or (B) "that it applies solely to Crabtree's ownership rights in a motion picture derived from the Work and for no other purpose." *See* Compl. ¶ 47. The first alternative is itself based on two alternative theories: that the Certificate of Authorship was procured via fraud, or that it lacked consideration. *See id.* ¶ 44. The fraud statute of limitation applies only to the argument that the contract is invalid, and to the fraud-based theory as to invalidity, not to the no-consideration theory or the request for declaratory relief as to the meaning of the contract. *See* Cal. Code Civ. P. § 338(d).

184 Cal. 226, 241 (1920) (similar). But none of these cases show that this rule should apply to these facts. To the extent that Kirkman may have ever lulled Crabtree into feeling secure in his rights, or induced him not to sue, these actions squarely ended in 2012 when Kirkman conveyed to Crabtree that Crabtree would be bound by the Certificate of Authorship and that previous payments that might have resembled royalties on derivative uses were bonuses rather than royalties owed. Even Crabtree later wrote that this information is how he knew Kirkman had "trick[ed]" him into signing the contract. *See* DSUF ¶ 34. Thus, the statute of limitations for fraud claims began to run, at the latest, in 2012.

Finally, Crabtree also argues that the Certificate of Authorship should be found invalid because it was not countersigned by Kirkman. *See* MPA at 49. But this theory is not pleaded in Crabtree's Complaint. The Complaint alleges that the Certificate of Authorship is invalid on the basis of fraud, and the Court finds that the statute of limitations bars this argument. *See* Compl. ¶¶ 43–47.

Accordingly, summary judgment will be granted to Defendants on the second cause of action, and on the third cause of action to the extent it seeks to invalidate the Certificate of Authorship on the basis of fraud.[21]

### C. Crabtree's fourth cause of action for breach of contract is not time barred by the breach of contract statute of limitations.

There is a two year statute of limitations for breach of oral contract claims in California. Cal. Code Civ. P. § 339. Defendants argue that this bars Crabtree's fourth cause of action for breach of contract.[22] This argument fails, for the reasons set forth below.

As an initial matter, contrary to Kirkman's arguments, a breach of contract claim accrues when a breach occurs, not when a "repudiation" of the contract occurs. *See Brewer v. Simpson*, 53

---

[21] As described in the previous footnote, this holding does not apply to the third cause of action to the extent it seeks either to invalidate the certificate of authorship for lack of consideration or seeks a declaratory judgment as to the meaning and scope of the certificate of authorship.

[22] For the purposes of this Motion, Defendants assume that an oral contract existed between Crabtree and Kirkman on the terms Crabtree described, whereby Crabtree was entitled to royalties on derivative uses of the work. *See* MPA at 26 n.4. The Court will do the same.

1    Cal. 2d 567, 593 (1960) (for purposes of the statute of limitations, a plaintiff "not bound to treat her

2    contract as abandoned at any particular time prior to the date when [defendants'] performance

3    became due.") The question before the Court, therefore, is when did the purported breach of the

4    asserted provision regarding derivative royalties occur, not when did Kirkman repudiate Crabtree's

5    entitlement to such royalties. In addition, as discussed above, the question of Crabtree's ownership is

6    distinct from the question of his entitlement to derivative royalties as one can be entitled to

7    derivative royalties by contract even if one is not a copyright owner. Therefore, Kirkman's

8    repudiation of Crabtree's ownership is of no moment with respect to when the breach claim accrued.

9         First, there does not appear to have been any breach of contract prior to the deal with

10   Amazon. On previous derivative deals, the evidence shows that Kirkman paid Crabtree money in

11   connection to the deal. *See* DSUF ¶¶ 18 (Kirkman paid Crabtree in connection with the Paramount

12   deal), 20 (Kirkman paid Crabtree in connection with the MTV deal). Although Kirkman later

13   claimed that these were not royalty payments and instead "bonuses," these later assertions do not

14   prove that Kirkman had previously breached the contract—if Kirkman paid the money owed under

15   the contract but insisted that it was for some other reason, that would not necessarily constitute a

16   breach of contract. The evidence before the Court does not prove that Kirkman's payments were any

17   different from what Crabtree should have been owed. Further, when Kirkman made clear in 2012

18   that he did not believe that Crabtree was owed money for derivative works, there was no derivative

19   work at issue to pay money for. Rather, the use at issue was digital editions that Kirkman explained

20   were akin to TPBs, and thus their contract did not require payment for them. Kirkman's statement

21   that he intended to repudiate the contract was not a breach of contract for the purposes of the statute

22   of limitations. *See Brewer*, 53 Cal. 2d at 593. The evidence before the Court suggests that the first

23   breach of the contract to pay royalties on derivative works occurred when Amazon began paying

24   royalties for the episodic show and Kirkman did not pay Crabtree a share. The record is not clear on

25   when this occurred, but Crabtree learned of it in August 2020, less than two years before he filed suit

26   in January 2022. *See* PSUF ¶ 70. For this reason, the undisputed facts do not show any breach of

27   contract that would cause the statute of limitations to have expired as of January 2022.

28

1      Second, even if there was a prior breach of contract, the continuing accrual doctrine saves the

2  claim to the extent it is based on recent breaches of contract. "Under the continuous accrual doctrine

3  each breach of a recurring obligation is independently actionable." *Gilkyson v. Disney Enters., Inc.*,

4  244 Cal. App. 4th 1336, 1341 (2016) (*citing Aryeh v. Canon Bus. Sols., Inc.*, 55 Cal. 4th 1185, 1199

5  (2013)). "Because each new breach of such an obligation provides all the elements of a claim—

6  wrongdoing, harm, and causation—each may be treated as an independently actionable wrong with

7  its own time limit for recovery." *Aryeh*, 55 Cal. 4th at 1199 (internal citations omitted). An

8  obligation to pay royalties for copyrighted material is "unquestionably a continuing one." *Id.* at

9  1343. Here, regardless of whether Kirkman failed to pay previous royalties, Kirkman failed to pay

10  royalties for the Amazon show. This new breach of the purported contract independently meets all

11  required elements and is therefore independently actionable. *See Aryeh*, 55 Cal. 4th at 1199.

12  Kirkman's arguments otherwise are not persuasive. Kirkman attempts to distinguish from

13  *Gilkyson*—which squarely held that continuous accrual applies to royalties—by noting that *Gilkyson*

14  involved a written contract where previous payments were made. These differences are not

15  dispositive, and do not affect the application of the holding from *Gilkyson.* Nothing in *Gilkyson*

16  suggests that these facts should change the overall rule. *See Gilkyson*, 244 Cal. App. 4th at 1341.

17      For these two independent reasons, the Court holds that the statute of limitations does not bar

18  Crabtree's fourth claim for breach of contract.

19
20
    **D. Crabtree's remaining claims for declaratory relief as to the Certificate of Authorship are not time barred (certain theories pleaded as part of the third cause of action).**

21      Crabtree seeks a declaratory judgment that the Certificate of Authorship is either invalid for

22  lack of consideration or "applies solely to Crabtree's ownership rights in a motion picture derived

23  from the Work and for no other purpose.[23]" *See* Compl. ¶ 47. Defendants argue that this claim is

24  barred by the statute of limitations for breach of contract. *See* MPA at 28–29. This argument fails.

25
26
_____

27  [23] Crabtree also sought declaratory relief invalidating the Certificate of Authorship for fraud. As described
28  above, the claim is time barred to the extent based on, so Defendants will be granted summary judgment as to
  the fraud theory of the third cause of action.

"The limitations period for declaratory relief claims depends on the right or obligation sought to be enforced." *Ginsberg v. Gamson*, 205 Cal. App. 4th 873, 883 (2012). For a claim seeking declaratory relief as to the meaning of a written contract, the statute of limitations is four years. *See id.* The statute of limitations does not begin to run until the written contract is breached. *See id.*; *see also Romano v. Rockwell Internat., Inc.*, 14 Cal. 4th 479, 488 (1996) ("A cause of action for breach of contract does not accrue before the time of breach").

Here, the evidence before the Court does not show any breach of the Certificate of Authorship, and so there is nothing suggesting the statute of limitations ever began to run. Kirkman points to the sale of toys, but there is no evidence that toys were actually sold, just emails discussing the possibility. DSUF ¶ 38. Because the Certificate of Authorship does not discuss royalties, failure to pay royalties, or other possible breaches of Crabtree and Kirkman's oral contract regarding Crabtree's compensation, would not be a breach of the Certificate of Authorship (the relevant contract that Crabtree seeks a declaratory judgment as to) and so are not relevant. Defendants' arguments fail. The claims for declaratory relief as to the Certificate of Authorship that are not based on fraud—that is, the no-consideration theory and questions as to scope—are not time barred. The claim that is based on fraud is time-barred for the reasons discussed above with respect to the fraud claim.

### E.  The Court will not grant summary judgment as to TPBs, because Crabtree seeks no relief as to TPBs.

Defendants also seek summary judgment that Crabtree is not entitled to royalties on TPBs. *See* MPA at 29. But Crabtree expressly states that he is not seeking such royalties[24], and no part of his complaint seeks them. The Court does not see any issue here on which to grant summary

---

[24] Defendants note that Crabtree's expert counted TBPs in damages calculations. Based on Crabtree's representations in the MPA, the Court understands that Crabtree has no intention of seeking such damages. Should Crabtree later seek them, the Court will hold Crabtree to his representations in the MPA.

judgment.[25] The Court will not grant summary judgment on a claim that is not found in the Complaint.

**V.   <u>Conclusion</u>**

For the reasons stated herein, Defendants' Motion is GRANTED IN PART:

1.  The Motion is GRANTED as to Crabtree's first cause of action for declaratory relief that he is a joint author of *Invincible*;

2.  The Motion is GRANTED as to Crabtree's second cause of action for promissory fraud;

3.  The Motion is GRANTED as to Crabtree's third cause of action for declaratory relief as to the Certificate of Authorship to the extent it seeks to invalidate the Certificate of Authorship on the basis of fraud, but the Motion is DENIED as to Crabtree's third cause of action to the extent it seeks either to invalidate the Certificate of Authorship on the basis that it lacked consideration or to clarify the meaning and scope of the Certificate of Authorship;

4.  The Motion is DENIED as to Crabtree's fourth cause of action for breach of oral contract; and

5.  The Motion is GRANTED as to Crabtree's sixth cause of action for an accounting to the extent it seeks an accounting based on authorship or copyright ownership, but the Motion is DENIED as to the sixth cause of action to the extent it seeks an accounting based on breaches of contract.


IT IS SO ORDERED.

Dated: November 22, 2023

_____

MAAME EWUSI-MENSAH FRIMPONG

United States District Judge

---

[25] Crabtree notes that the only possible issue related to TBPs that the Court could adjudicate is what exactly constitutes a TBP. The Court notes that Crabtree and Kirkman previously disagreed as to whether digital editions were more akin to TBPs or single issue sales, and so this is perhaps a live dispute. But the parties have not fully briefed this issue, and so the Court finds it would not be prudent to decide it.